

## IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WALTER PARKER**, 4247 Locust Street, #119, Philadelphia, PA 19104<br><br>Plaintiff<br><br>v.<br><br>**4247 FX, Inc.**, a Pennsylvania corporation, d/b/a **FAIRFAX APARTMENTS ASSOCIATES,** a Pennsylvania corporation, **GARY KERSTEIN,** a Pennsylvania resident, and **JOYCE PRENTISS**, a Pennsylvania resident,<br><br>Defendants | Case No: **16  2710**<br><br>**Complaint for violations of the Fair Labor Standards Act** |

## COMPLAINT

Plaintiff **Walter Parker**, in the above-styled action, based upon information and belief, sets forth and avers the following:

### THE PARTIES

1. Plaintiff is an adult male who (for now) resides and is domiciled in the Commonwealth of Pennsylvania, at the above-listed address.

2. Defendant **Fx 4247, Inc.**, d/b/a Defendant **Fairfax Apartments Associates**, is a Pennsylvania corporation, whose principal place of business is Plaintiff's home address, the building known as the Fairfax Apartments, where Plaintiff has lived since October, 1986, when he moved to Philadelphia from Manhattan with his late mother, Penny Parker.

3. Defendant **Gary Kerstein**, son-in-law of building owner **Alan H. Klein**, took over management of the Fairfax during or around 2005, secondary to the retirement of Eugene M. Martin, and the death of former building manager Robert Radke.

4. Defendant Joyce Prentiss is one of the principal owners of Defendant 4247 FX, Inc., and its director of operations. She, and the other listed defendants, may be served at the Fairfax, or at their residences.

## NATURE OF ACTION

5. This is a complaint for violation of the Fair Labor Standards Act (FLSA), relating to unpaid overtime and on-call wages for hours worked by Plaintiff, and for supervisory and on-call time expended by Plaintiff, without compensation, in his capacity as an on-call and shift worker (erroneously called "desk *manager*" by Defendants) at the front "concierge" desk ("the Desk") at the Fairfax, between 1999 and the present.

## JURSIDCTION AND VENUE

6. Subject-matter jurisdiction is conferred by 28 USC §1331, by the existence of a federal question under the Fair Labor Standards Act, 29 USC §201-219, specifically 29 USC §216(b).

7. Personal jurisdiction is conferred over all parties, as they are all domiciled, reside, or regularly conduct business at the Fairfax Apartments, in Philadelphia, Pennsylvania.

8. Venue is proper for the reasons outlined in paragraph 7 above.

## BACKGROUND

9. Plaintiff incorporates the contents of all previous paragraphs, as if stated fully herein.

### Front Desk History

10. The Desk is a concierge-like station which functions as the primary communications hub between residents, building staff, contractors, first responders, media, and the general public.

11. Plaintiff began shift work at the front desk in or around April, 1988, after his late mother, Penny, was hired as the desk manager. Plaintiff worked mostly evening shifts during the

week and overnights on the weekend (he was fulltime on the day shift for five months in 1995), while Penny was responsible for calculating hours worked for the payroll, scheduling all shifts, and for being on-call 24/7/365 as a last-resort to fill in for late or absent workers. While she was sleeping or otherwise unavailable, Plaintiff (the assistant manager), performed these duties.

12. Until 1993, the desk manager (Penny) received an additional $145.00 per pay period added to her paycheck as compensation for being on-call and for calculating the payroll, and had, at all times since moving in, in 1987, paid full rent of $600.00 a month as a tenant. Her additional pay was in no way tied to her function as desk manager.

12x. In 1993, Penny and Defendants agreed to abolish the desk manager's $145.00 biweekly gross salary, and instead Penny's rent was reduced to $286.00 a month, from $600.00 per month, as a *nontaxable benefit* in return for her being on-call, scheduling, and handling the payroll, but not for any overtime shift work at the Desk. The few times she had asked about paid overtime, she was told it was not available, and the one time she mentioned the various wage laws regarding Plaintiff's overtime, both were threatened with firing and eviction.

14. The above arrangement remained more or less unchanged until early 2007, when Penny's health began taking a turn for the worse. Unknown to Plaintiff, she was dying of late-stage cancer, but still attempting to complete her desk shifts. With no support for her from other building staff, Plaintiff began extending his evening shifts well into each overnight for which Penny was scheduled to work, usually three or four hours, at which point he would awaken Penny, who would complete the shift, with Plaintiff's overtime hours credited to her paycheck, a practice that had dated to 1992 and before. Penny herself never worked any overtime.

15. On Sunday, July 22, 2007, at or around 6:30am, while working an overnight shift at the desk, Penny stumbled in the lobby, hitting her head on the marble floor (this was witnessed

3

by a tenant who was living in the building at the time). She was assisted back home, and three days later died of late-stage cancer, at which point Plaintiff took over her job duties, though without any hiring or firing power. Plaintiff instead was responsible for the 24/7/365 on-call coverage for absent or late desk workers, but without the assistance that he had been providing for his late mother, whose shifts he had also taken over.

16. Including the night she died (he took no time off for bereavement), Plaintiff was working ***seventy scheduled hours weekly*** (seven overnights plus "double" shifts on Thursday and Friday evenings), plus his on-call hours, sometimes pushing his weekly hours close to a hundred per week, until he was cut back to fifty-six hours a week (the seven overnight shifts), plus on-call hours, which usually ran from as few as two hours a week, to as many as twelve or fifteen.

17. From January 20, 2008, through February 29, 2016, when he was forced to take an extended leave of absence, Plaintiff worked a minimum of eight hours every single day, and often many more, for ***2,962 consecutive days***, or 330 more than Cal Ripken's ***Iron Man*** streak:



18. Fairfax desk staff receive up to thirty (30) days of accrued sick leave, two weeks of vacation (all vacation time has been taken as cash), and six (6) personal holidays per year (which

4

Case 2:16-cv-02710-CDJ Document 1-1 Filed 06/02/16 Page 5 of 16

do not accrue), to be used at the employee's discretion. By Plaintiff's calculation, his paid time off would have ended on or around May 13, 2016, with the additional FMLA leave (which Defendant claims it was not required to provide) having Plaintiff return on August 13, 2016.

19. Initially, when told that Plaintiff would not be coming into work that evening, the response was one of, to put it mildly, frustration.

20. On March 2, 2016, at or around 10:30am (telephone records can confirm exactly when), a building staffer began *pounding* on Plaintiff's door, claiming that Marla Klein (a Fairfax executive and wife of Defendant Kerstein) *needed* to speak with Plaintiff, who then spoke with Ms. Klein on the telephone. Ms. Klein then said that she would "not accept" Plaintiff's e-mail notice. Advised of the legal situation, she said she was referring the matter to an attorney.

21. On March 4, 2016, Plaintiff sent Defendant the following e-mail:

> Dear Gary and Marla:
>
> This letter follows up on my e-mail from Monday where I notified you of my indefinite leave of absence from the desk, which began with my having called out on Monday, due to a personal and family emergency which has made this leave necessary. As noted in the letter, *I have not resigned the desk nor abandoned my apartment.* It was my intention to return on August 13, 2016, or whenever my accumulated leave (sick, personal, and 12-week FMLA leave) was exhuausted. Your attempt to contact me by knocking on my door was not appropriate; I am asking instead that you communicate only in writing (e-mail is fine with me).
>
> Despite my having put in for overtime pay to which I am legally entitled, I was not paid at the overtime rate for hours worked each week over forty. Please also note that you have never put the mandatory wage/EEOC signs in the desk area, or any common area, as required by federal law. The threat of termination and eviction had prevented me from raising this issue sooner, and it is my hope that we may resolve this as quickly as possible, since my outstanding unpaid overtime runs at least several tens of thousands of dollars. Please adjust this paycheck accordingly immediately, and upon payment, I will submit to you an invoice for all outstanding overtime in the next week; otherwise, I will be forced to recover the money via a federal wage action.
>
> It is my hope that any disputes relating to accounting, as above, can be put behind us, so we may all move forward on firmer ground. Please restrict any contact during my leave solely to writing.

22. Also on March 4, 2016, Defendants' attorney, Daniel O'Meara, of Montgomery McCracken, sent the following letter in response to Plaintiff (emphasis added):

5

> I am writing on behalf of my client, Fairfax Apartments, to you, in your capacity as an employee of Fairfax apartments. Recently, e-mails were sent from your e-mail account to my client making various demands, including that you be paid for all accrued but unused paid time off, and that you then be on federal Family and Medical Leave Act (FMLA) leave for 12 weeks thereafter, and that your job be held open for you in your absence until August [13], 2016. ***You have not stated to management why you cannot work, and you continue to live in a <u>rent-subsidized apartment</u>*** within Fairfax Apartments. Note also, that you received a monthly $700 rent abatement that was to compensate you for any overtime premium.
>
> Fairfax Apartments does not have any accrued paid time off, so you have no accrued-but-unused time off. In any event, leave under the leave under the FMLA is unpaid leave. You have no legal right to such leave, or any leave paid or unpaid.
>
> My client nonetheless values your past service as an employee, and wants to help you on a personal level. Accordingly, in light of the request above, Fairfax Apartments will pay you Five Hundred Forty-Six Dollars ($546.00) per week for the next five weeks, pursuant to normal Fairfax Apartments payroll practices. In addition, we will leave your job open for you (i.e., you may return to the job) until June 1, 2016. We will need to hear from you with certainty by May 15, 2016, that you will return to the job, for us to keep it open for you. What we have offered is not in any way legally required. We are doing this as a gesture of good will, and because we appreciate your service to date.
>
> ***All communications concerning legal matters (including any leave or overtime issues)*** should be directed at me, Daniel P. O'Meara, at [MMWR's] contact information above.

23. This letter is disingenuous, and legally inaccurate, if not downright fraudulent:

    a. Under state and federal law, Plaintiff cannot be made worse off than he would be without the overtime pay, something clearly the case here. His wages cannot be "signed away." Even assuming this "abatement" were a legitimately reduced rent, which it is not,[1] it leaves Plaintiff worse off than had he been paid overtime. Even with a regular forty-hour week, Plaintiff could have paid similar rent, and had evenings and weekends free for the eight consecutive years he worked without a single day off.

    b. The prior desk manager (Penny) was paid for being on-call and managing the schedule, not for working more than forty hours a week at the Desk. Defendant's claim that the "abatement" covers overtime leaves no money for the ***on-call*** time for which Penny's rent was

---

[1] Similar apartments within commuting distance rent for similar or lower prices, while HOA fees on condos are even lower, with little down payment required.

6

discounted. Conversely, an abatement which covers the on-call time, as it did for Penny, would not have covered any overtime. This issue did not arise until 2007, having been suppressed by previous threats of retaliation against Penny.

   c. The rent "abatement" is nonexistent, since Plaintiff could easily have commuted from Upper Darby, where a similar apartment can be rented at or near the $450.00 he was paying. Even assuming no paid overtime, Plaintiff would have had evenings and weekends free. With the overtime, Plaintiff could easily have purchased a six-figure condominium with a lower HOA fee than $450.00, often including utilities and hi-speed internet, plus lavish common areas.

   d. *You load sixteen tons...* (any "rent" over $450.00 is a truck system).

   e. Neither Plaintiff, nor any roommate (Penny or otherwise) was ever treated as a regular, full-paying tenant, nor had he ever been informed that he even was one. He was denied a request to move to another apartment, after being forced to abandon his old apartment (806), for a much inferior one, whose details Plaintiff would rather not share until necessary, as this is pled in the alternative to the phantom-abatement argument in subparagraph a) above.

  24. On March 18, 2016, Plaintiff sent Defendant a notice of workplace injury and a request for ADA accommodation which, in pertinent part, stated:

> ***"Please also consider this letter an ADA notification that, <u>until further notice</u>,*** I am only capable of working in a highly structured environment where I report only to a single individual and do not deal with the public."

  25. This ***short-term*** request was triggered by an ***external threat*** which put his life at risk. Subsequent notice was given that this issue had been resolved, and that the long-term issues related to a job he ***inherited*** when his mother died, had never been properly evaluated.

  26. On March 28, 2016, Defendant's attorney sent Plaintiff a letter which, in pertinent part, stated in part one of the letter:

7

> Dear Mr. Parker:
>
> I am writing in response to your March 18, 2016 correspondence in which you have indicated that you are incapable of dealing with the public. As interacting with the public is an essential function of your job, and there are no other positions available at Fairfax Apartments, we are currently unable to staff you in any other capacity to accommodate your condition.
>
> Given your claims that the injury you have suffered is work-related we have contacted our Workers Compensation Insurance Provider and notified them of your claim. We have also provided the provider with your contact information so that they may reach out to you and investigate your claim.
>
> As mentioned in my March 4, 2016 correspondence, as a small employer with less than ten employees, Fairfax Apartments is not governed by the Family Medical Leave Act, and you are not entitled to the 12 weeks of unpaid leave provided for under the Act. Fairfax Apartments also does not have a policy that provides accrued paid time off, and you are therefore not entitled to any paid time away from work.
>
> Further, you have requested eight weeks of unpaid leave pursuant to Philadelphia City Ordinance 9-3200. Please note that as a small employer, employees are entitled to four weeks unpaid leave pursuant to this Ordinance, and employees seeking to take such leave must provide a certification pursuant to 9-3204 and appropriate accompanying documentation within 45 days of the employer's request. Fairfax Apartments is hereby requesting that you provide this certification within 45 days.

27. The circumstances which triggered the ADA request were resolved shortly thereafter, with the employer properly notified that Plaintiff was medically cleared to return.

28. Part II of the letter dealt with the 9-3200 leave request, since withdrawn, and is not included, but Part III is highly relevant:

> I am also reminding you that out of appreciation for your service and to help you in your time of need, Fairfax Apartments has agreed to continue paying you until April 8, 2016. Given your recent "ADA notification" and request for workers compensation, you will be required to be evaluated by a medical professional prior to returning to work to assure that you are capable of performing the essential functions of your job.
>
> Additionally, as you are aware, you receive a rent subsidy of $700 per month as part of your compensation. You will no longer be paid by Fairfax Apartments as of April 9, 2016. Although you will receive the rent subsidy for April 2016, Fairfax Apartments reserves the right to thereafter end your rent subsidy. You will be given sixty (60) days written notice of any rent increase.
>
> March 28, 2016
> Page 3
>
> My client wishes you a speedy recovery. Please be reminded to direct all communications concerning legal matters (including any leave or payment issues) to me, Daniel P. O'Meara, at the contact information above.
>
> Thank you.
>
> Very truly yours,

8

representative of Fairfax Apartments to inquire as to your condition and ability to perform the essential functions of your job. Please provide us with your medical provider's information so

29. The threat of this hostile, ***pre-employment psych exam***,[2] was later reduced to a requirement of medical clearance from Plaintiff's own PCP, which Plaintiff obtained first on April 29, 2016, and again on May 27, 2016.

30. On April 6, 2016, Plaintiff sent Defendant's counsel the following e-mail:

> I won't be seeking the four weeks of unpaid leave under Philadelphia ordinance 9-3200, as I was informed that all possible steps were taken to mitigate that situation, which ahs not escalated since. At the time of the incident, much less was known than was discovered subsequently.
>
> As I had been performing the job when informed of the situation which caused me to take leave, it was external conditions which were at the root, though I am still arranging for a full medical evaluation relating to the long-term impact of the job on my condition(s), and that will cover the medical clearance you seek in the short term, assuming I am cleared. I have heard from your insurance provider and will be updating them as well. As you asked for in previous correspondence, I will let you know by May 15, 2016 or sooner about my medical status.

31. On April 26, 2016, Defendant's counsel contacted Plaintiff. This is part one:

> https://www.eeoc.gov/policy/docs/guidance-inquiries.html#N_55_ .
>
> Your own correspondence raises concerns as to whether or not you are able to perform the functions of your job. In your March 4, 2016 correspondence you characterized your leave as "indefinite" and you informed Fairfax Apartments that you did not intend to return to your position until August 13, 2016. In your March 18, 2016 correspondence you indicated that "it is no longer safe for [you] to be working. Additionally, the anxiety and stress created by the two incidents, as well as an overall, work-related progression of [your] ADHD/Asperger's condition necessitates that [you] undergo a rather extensive medical evaluation process related to [your] employment and general employability as it relates to the desk job."
>
> In this same correspondence you also advised that you are "only capable of working in a highly structured environment where [you] report only to a single individual and do not deal with the public." In my March 28, 2016 correspondence, I informed you that "as interacting with the public is an essential function of your job, and there are no other positions available at Fairfax Apartments, we are currently unable to staff you in any other capacity to accommodate your condition."
>
> Given your continued reference to your medical condition and its potential impact on your "employability," Fairfax Apartments has a reasonable belief that you may be unable to perform the essential functions of your job. You have also stated that the position itself has exacerbated your condition. Given the fact that your position is a critical one in safeguarding our residents, and for your own safety, Fairfax Apartments needs to be assured that you are medically cleared to perform the essential functions of your job before we can return you to your previous position.
>
> At this time, we are willing to accept a medical report and certification from your own physician. You will need to execute a HIPAA authorization that permits a designated representative of Fairfax Apartments to inquire as to your condition and ability to perform the essential functions of your job. Please provide us with your medical provider's information so that we may write to him/her and request an evaluation be conducted and attach all correspondence exchanged regarding your condition as well as your job description.
>
> We reserve the right to send you for an evaluation before a physician of our choosing should the documentation and/or certification provided by your medical provider be insufficient.
>
> Again, we wish you a speedy recovery and are willing to engage in an interactive process with your regarding your request for an accommodation. Please note however, that given the essential functions of your job, a position which does not involve dealing with the public is not a reasonable accommodation.

---

[2] Presumed defense counsel has a history of this specific tactic, used fraudulently in a case with a clear conflict.

9

32. Plaintiff avers pretext, and further avers, based on Defendants' own letter, that Defendant had no reason to justify medical clearance, since Plaintiff had represented that he was doing fine, that the short-term issue had been rectified, and that he was just as qualified to perform work on April 26, 2016 as he had been on February 29, 2016, as well as for the previous eight years without a day off, and twenty-eight years overall.[3] Never at any time was any resident in danger; Plaintiff's safety record speaks for itself in ways his peers' certainly cannot.

33. While the workman's comp investigation is ongoing, Defendant's initial response was that Plaintiff had suffered a *knee* injury in January, an obvious error. Had returning to work gone smoothly, only the long-term evaluation would have remained, with Plaintiff's continued employment indefinitely preferable to homelessness and starvation.

34. This is part two of the letter:

> April 26, 2016
> Page 3
>
> Should you be medically cleared by your physician to return to your prior position, we will have forty hours per week available to staff you. At this time, there are no overtime opportunities available. As such, since the $700.00 rent abatement served to compensate you for the premium on all overtime worked, your rent may be subject to increase at any time, with appropriate notice. Thereafter, if overtime becomes available and you wish to pick up additional hours, you will be compensated at a rate of time and a half. You will not receive the rent abatement in addition to time and half compensation.
>
> As to your recent correspondence regarding your Workers Compensation denial, please note that Fairfax Apartments and I are not involved in that decision making process. As such, communicating with me regarding your Workers Compensation claim is ineffective. Please direct your correspondence concerning your Workers Compensation claim to the carrier.
>
> Please be reminded to direct all communications concerning these legal matters (including any leave or payment issues but excluding workers compensation) to me, Daniel P. O'Meara, at the contact information above.
>
> Thank you.
>
> Very truly yours,

---

[3] Plaintiff's "valuable service" to which Defendants refer includes many emergencies, not the least of which was the fall of eight year-old Emmeline Valadez to her death from apartment #921 (the only other apartment offered Plaintiff in 2008, and one over which the building-roof had previously collapsed) on the morning of September 17, 2014, landing literally outside of Plaintiff's (occupied) bedroom window, while Plaintiff himself was at the desk. This tragic circumstance did enable Plaintiff to notify Defendant Kerstein of the situation even before first-responders arrived. Plaintiff has also handled, with aplomb, incidents of domestic violence, and of a building worker mistaking a gas leak for polyurethane, almost literally blowing up the building. Normally, his shifts have minimal interaction with the general public, and then overwhelmingly with familiar, friendly *neighbors*, many of whom simply presumed, during his absence, that he was still working. He interacts within the building just fine.

10

35. Plaintiff avers, on the bases of temporal proximity and preponderance of the evidence (including the original March 4, 2016 letter), that his reduction in hours, pay, and the threat of reduced benefits (elimination of on-call pay), that Defendant was motivated by a retaliatory animus.

36. On May 11, 2016, Plaintiff notified Defendants, through their counsel, of his intent to return to work for the Sunday-Monday overnight shift of May 29-30, 2016, Memorial Day.

> Dear Mr. O'Meara:
>
> Regarding our previous correspondence, I have attached a medical clearance to return to work, which I received on April 29 (*note:* It says Mr. Walter but the doctor used my first name by mistake, you can call her to confirm it was me), along with a HIPAA release form for The Fairfax. It is my intention to return to work on the Sunday-Monday overnight shift which begins at 12:00am on Monday, May 30, 2016 (Memorial Day). Since you have stated that there are forty hours available, I intend to work the Sunday-Monday thru Thursday-Friday shifts, from midnight-8:00am if those are available (a signed version of this letter that will also be hand-delivered is being included in this attactment).
>
> As previously mentioned, when I took leave I was dealing with a short-term crisis situation which has long since been addressed and has passed, and my medical status now is the same as it was for the many years I have been performing this job, if not better for having had time off to attend to my affairs. As I am routinely supervised during the course of my shift, that supervision should allow the Fairfax to address any concerns about my ability to perform my work (which is an ongoing concern for all employees anyway). My ADA request from before is moot, since I will only be working the forty hours per week, and the overnight shifts offer maximum isolation (no job is an island).

37. On May 25, 2016, Plaintiff received a copy of a letter from Defendants' counsel to his primary doctor, Rebecca Davis. This is part one:

> Dear Dr. Davis:
>
> I represent Fairfax Apartments and am writing to follow up on your letter stating that Mr. Parker was seen by you on April 29, 2016 and is safe to return to work. My office has attempted to call you with follow up questions but has been unsuccessful.
>
> Pursuant to the April 26, 2016 letter to Mr. Parker, we require a medical report and certification from Mr. Parker's physician that indicates that the physician is aware of Mr. Parker's conditions, has reviewed Mr. Parker's job responsibilities, and that Mr. Parker is able to perform the essential functions of his job.
>
> Mr. Parker is a front desk attendant for Fairfax Apartments. His job responsibilities include: taking emergency phone calls and contacting police, fire, and ambulance services; taking emergency service calls from residents and contacting the Director of Maintenance and Superintendent; taking routine service calls from residents; manning the front desk in the lobby; monitoring continuous video cameras; interfacing with and greeting residents; interfacing with and greeting visitors and confirming acceptance of the visitors with residents; and assisting residents with lockouts and key replacement.
>
> We would very much like to return Mr. Parker to his position, but for the safety of Mr. Parker and our residents we need to confirm that it is safe to do so. Mr. Parker has indicated

11

38. If Defendant wanted a hostile Rule 35 examination to determine Plaintiff's employability, it should have moved this Court for one. This backdoor attempt speaks for itself. The only *true* threat to Plaintiff or the residents – physical *trespass* by internet stalkers – are being given tacit approval, despite their having taken a "wrecking ball" to a perfectly solid employment relationship. Copying the physician in this manner – itself a major area employer, owned by another client of Defendants' counsel – was unconscionable.

39. On extremely short notice, Plaintiff, now on *involuntary medical suspension*, yet not filing for unemployment or SSDI benefits, because he had been told he could return to work, after having gone several weeks without paying work, severely compromising his financial responsibility.

40. As a further attempt to meet Defendants' requirements, Plaintiff (who was finally diagnosed with Type II diabetes and needed a followup visit) was medically cleared *again* on May 27, 2016, two days after Defendants' counsel's letter, and where his doctor claimed that Defendants' attorney had not left any voicemail, before leaving one of their own to again communicate clearance. Despite this, Plaintiff heard nothing about whether or not he should return to work for his Sunday overnight shift, despite Defendants' admitted perception of disability.

41. When Plaintiff arrived at the Desk at midnight, May 30, 2016, also to retrieve a package (the very toner used to print this lawsuit, in fact), another desk worker had been assigned the double-pay, holiday shift.

42. Plaintiff avers that the conduct set forth hereinabove constitutes constructive termination. Consequently, on May 30, 2015, he notified Defendants' counsel by e-mail of his position, while invoking the four weeks of unpaid leave to which he is entitled in the event

12

Defendant claims he was never terminated, pending resolution of his SSDI and workman's comp claims.

### COUNT ONE: VIOLATION OF THE FLSA (UNPAID SHIFT OVERTIME)

43. Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs.

44. As set forth hereinabove, during all relevant times, Plaintiff was an hourly shift worker in the "building maintenance" category, and, as such, is covered by the mandatory overtime provisions of the Fair Labor Standards Act, 29 USC §§201-219, under which he is entitled to time-and-a-half (1.5x) his regular pay rate, for all hours worked over forty (40) in a given week.

45. As set forth in paragraphs 21 and 26 (Defendants' letters to Plaintiff), Defendant has already admitted to not paying Plaintiff pecuniary overtime to which he is entitled, and to have done so willfully, under what, at best, is pure ignorance of the law rising to the level of gross negligence, or, at worst, bald-faced human trafficking, albeit in *house slaves* in this case.

46. Plaintiff is (or was) a nonexempt, hourly, building-maintenance (or quasi-maintenance) worker, who, in reality, is not a manager, but merely on-call every hour, of every day, of every year, dating back to 2007, while his late mother was dying of cancer and working the desk herself, still scheduled to work the following evening after she died, at which point Plaintiff began working insane amounts of overtime not yet calculated, and which continued at only a slightly saner pace through his medical leave on February 29, 2016.

47. As set forth in paragraph 22 hereinabove, Plaintiff's $450.00 rent is of no pecuniary value to him, and is for the sole benefit of his employer, the Defendants. Without his job, he would never pay $1,150.00 for an apartment whose accurate description would put Plaintiff at risk of violating Rules 11 and 12(f).

13

48. Following is a summary of Plaintiff's extra hours worked, by year, from 2007-2016. It does not include extra hours worked prior to 2007, though there were many. The scheduled overtime is fixed at sixteen (16) hours per week (except for daylight-savings weekends), and is grouped separately:

| Year | Base Pay | Scheduled Overtime Extra Hours | Scheduled Overtime Amount Unpaid | Base Pay | Unscheduled Overtime Extra Hours | Unscheduled Overtime Amount Unpaid | Remarks |
|---|---|---|---|---|---|---|---|
| Pre-2007 | variable | variable | variable | variable | variable | variable | |
| 2007 | 9.00 | 975* | $4,387.50 | $7.50 | 150* | $ 562.50 | |
| 2008 | 9.00 | 832 | 3,312.00 | 7.50 | 150* | 562.50 | |
| 2009 | 9.00 | 832 | 3,312.00 | 7.50 | 126 | 472.50 | |
| 2010 | 9.00 | 832 | 3,312.00 | 7.50 | 245 | 968.75 | |
| 2011 | 9.00 | 832 | 3,312.00 | 7.50 | 230.50 | 864.375 | |
| 2012 | 9.00 | 832 | 3,312.00 | 8.50 | 335.50 | 1,425.875 | |
| 2013 | 9.00 | 832 | 3,744.00 | 8.50 | 444 | 3,774.00 | |
| 2014 | 9.00 | 832 | 3,744.00 | 8.50 | 438 | 1,861.50 | |
| 2015 | 9.00 | 48 | 216.00 | 8.50 | 6 | 27.00 | |
| 2015 | 9.75 | 784 | 3,578.00 | 9.25 | 203 | 938.875 | |
| 2016 | 9.75 | 136 | 663.00 | 9.25 | 47 | 217.375 | |
| **Subtotals** | | | 32,892.50 | | | 11,675.25 | |
| **GRAND TOTAL** | | | | | | $44,567.50 | |

## Administrative Remedies/Inability To Prosecute

49. In late March, Plaintiff filed a claim with the Wage & Hour division of the Department of Labor (referred by the PCHR, who said it seemed like he had a case), who declined to take the case due to limited resources. A third-party complaint involving Plaintiff and other current and former building staff, was recently made to the Pennsylvania Bureau of Labor Law Compliance. It has not been accepted or declined at this time.

50. Plaintiff avers that he was unable to file more timely complaints over this issue not only due to:

    a) threats of retaliation from Defendants, which were then carried out; but

    b) the logistical impossibility which prevented Plaintiff from doing so, due to his *Ripkenesque* of Twenty-Nine Hundred and Sixty-Two (2,962) days with at least one full, eight-

14

hour shift, and often more, in a position Defendants themselves have admitted carries "tremendous responsibility" for tenant safety. Unfortunately, as mere lay psychologists, they had yet to come across the research which demonstrates that Plaintiff's disability has the side effect of *honesty*, to a fault, the primary qualification for overnight work. His twenty-eight years without incident or "inside job" speaks for itself.

    c)    Further exacerbation of difficulties due to housing being tied to employment, as Defendant has already admitted.

51. For Defendants' conduct as set forth hereinabove, each and all Defendants are jointly, wholly, and separately liable, in both their corporate and personal capacities, in violation of the Fair Labor Standards Act (FLSA), 29 USC §216(b), the law under which Plaintiff bases his claim for relief.

52. Alternatively, Plaintiff is entitled to relief under the Pennsylvania Wage Payment And Collection Law ("WPCL"), and states a claim for relief on that basis.

53. Plaintiff is entitled to the following compensatory damages:

    a.    Under both the FLSA and WPCL, Plaintiff is entitled to unpaid time-and-a-half wages of ***at least*** FORTY-FOUR THOUSAND, FIVE-HUNDRED SIXTY-SEVEN DOLLARS AND FIFTY CENTS ($44,567.50 US).

    b.    Alternative to paragraph 50 above, under the PWCL, Plaintiff is entitled to liquidated damages of THREE HUNDRED THOUSAND DOLLARS ($300,000.00), based on $500.00 per biweekly pay period for each separate violation dating back to 2007.

    c.    Plaintiff is entitled to liquidated damages of double any award under the FLSA, or 125 percent of any award under the PWCL, whichever is greater.

    d.    Plaintiff is entitled to complementary damages under either law when the other

law does not apply, in an amount to be determined at trial.

54. Secondary to Defendants' specific retaliatory conduct, as set forth in paragraph 32 above, Plaintiff is entitled to punitive damages, in an amount to be determined at trial.

55. Plaintiff is further entitled to reasonable attorney fees, costs of suit, and such other and further relief as this court may deem just and proper in order to make Plaintiff whole.

### COUNT TWO: VIOLATION OF THE FLSA (UNPAID ON-CALL OVERTIME)

56. Plaintiff incorporates by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs.

57. In addition to the straight, time-and-a-half overtime to which Plaintiff is entitled, he has also been "on call" on a *24/7/365* basis, having ensured coverage for literally every shift during his 2,962-day attendance streak that ran from 2008-2016, often on little sleep, with no notice, and on February 4, 2008, with *one* hour of sleep after having spent all day packing and moving to an inferior apartment, solely for the benefit of his employer.

58. Plaintiff avers that his lease of $450.00 monthly rent is the correct price, as it covers the "HOA fee" for a similarly situated condo, while a similarly-situated rental unit could easily have been obtained well within commuting distance.

59. Plaintiff avers that the prior desk manager, Penny Parker, was given a similar lease (adjusted for market and inflation), without having to work shift overtime, and with the benefit of having Plaintiff as the assistant manager, a privilege she made use of with regularity, and one which allowed her to perform limited-duty work (with Plaintiff again uncompensated for his assistance) until three days before she died, in 2007.

PRAYER FOR RELIEF

60. With no *actual* rent abatement, Plaintiff should have been paid at the rate of SEVEN HUNDRED DOLLARS PER MONTH ("$700.00/mo."), for each month since August, 2007, for a total of One Hundred Two months, and SEVENTY-ONE THOUSAND FOUR HUNDRED DOLLARS ($71,400.00 US).

61. Plaintiff avers that Defendants' conduct, as already set forth hereinabove, is in violation of the FLSA, and it is that basis on which he states this claim for relief. Alternatively, Plaintiff avers that Defendant is also in violation of the PWCL, and states an alternative and complementary claim on that basis.

62. Plaintiff is entitled to the following relief:

    a. Under the FLSA, liquidated damages of ONE HUNDRED FORTY-TWO THOUSAND EIGHT HUNDRED DOLLARS ($142,800.00 US), or double the unpaid wages.

    b. Under the PWCL, liquidated damages of THREE HUNDRED THOUSAND DOLLARS ($300,000.00), based on $500.00 per biweekly pay period for each separate violation dating back to 2007.

    c. Complementary damages under either statute where the other does not apply, in an amount to be determined at trial.

63. Secondary to Defendants' specific retaliatory conduct, as set forth in paragraph 32 above, Plaintiff is entitled to punitive damages, in an amount to be determined at trial.

64. Plaintiff is further entitled to reasonable attorney fees, costs of suit, and such other and further relief as this court may deem just and proper in order to make Plaintiff whole.

## PRAYER FOR RELIEF

Plaintiff prays for the following relief:

    1. Compensatory and liquidated damages in the amount of SIX HUNDRED

THOUSAND DOLLARS ($600,000.00);

    2.    Punitive damages, in an amount to be determined at trial;

    3.    Costs of suit, including reasonable attorney fees;

    4.    A declaration that Defendants have violated the FLSA and PWCL;

    5.    An injunction requiring Defendants to comply with the FSLA and PWCL going forward; and

    6.    Any other relief deemed just and proper by this Court.

This the 2nd day of June, 2016.

*/s/ Walter Parker*
WALTER PARKER, Pro Se
4247 Locust Street, #119
Philadelphia, PA 19104
Waltfx4247@aol.com
(267) 423-1405

Concerning changes in income:

I have been on an involuntary medical suspension since April 13, after I had paid leave following having to take off from work due to a family situation. I did have medical clearance on April 29, 2016, however, my employer's attorney (as noted in complaint) was trying to reach the doctor who cleared me. As of this writing, I remain on such suspension.