## IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WALTER PARKER,** 4247 Locust Street, #119, Philadelphia, PA 19104, and **GORDON ROY PARKER,** | : | |
| Plaintiffs | : : : | |
| v. | : | **Case No: 16-cv-2710 CDJ** |
| **FAIRFAX APARTMENTS ASSOCIATES,** a Pennsylvania corporation, and **4247 FX, Inc.,** a Pennsylvania corporation, **JOYCE PRENTIS,** a Pennsylvania resident, **GARY KERSTEIN,** a Pennsylvania resident, **MARLA KLEIN KERSTEIN,** a Pennsylvania resident, and **ALAN H. KLEIN,** a Pennsylvania resident, in their individual and professional capacities, AND JOHN DOES #1-10, | : : : : : : : : : : : : | **Complaint for Violations of the Fair Labor Standards Act, The Pennsylvania Wage Payment And Collection Law (PWCL), Breach Of Contract, Fraud, Unjust Enrichment, and violations of the Fair Housing Act.** |
| Defendants | : : | |

FILED

JUL 11 2016

MICHAEL E. KUNZ, Clerk
By_____Dep Clerk

## AMENDED COMPLAINT

Plaintiffs **Walter Parker ("Walt") and Gordon Roy Parker ("Gordon")**, in the above-styled action, on information and belief, collectively and individually aver the following:

## THE PARTIES

1.  Plaintiffs are adult full brothers who are domiciled in and reside within the Commonwealth of Pennsylvania, at the address listed for them in the caption ("The Fairfax").

2.  Defendant Fairfax Apartments Associates (#711999) owns and operates The Fairfax:

3.  As the following screenshot, taken from the Pennsylvania Secretary of State's website, clearly indicates, Defendant 4247 Fx, Inc. is the sole officer listed for Defendant Fairfax Apartments Associates:[1]

---

[1] Plaintiffs are aware of Defendants' disclaiming of ownership or involvement in their initial motion to dismiss. Since government records are official, they must rely on those over claims from their adversary which they may believe to be true, but which nonetheless may be inaccurate.



4.  As the following screenshot from the Secretary of State's website clearly indicates, Defendant Alan H. Klein is an officer of Defendant 4247 Fx, Inc., and, in his individual capacity, an owner of The Fairfax:



5.  As the following screenshot from the Secretary of State's website clearly indicates, Defendant Joyce Prentis is an officer of Defendant 4247 Fx, Inc., and relative of Alan H. Klein. Like all in the Klein family, she jointly runs The Fairfax and may be served there or at her home.

6.   Defendant Gary Kerstein has been the general manager of The Fairfax since around 2000.  It is he (and Defendant Marla Klein Kerstein, his wife) to whom all Fairfax Desk staff ultimately report, and to whom Walt reported, both as employee and as resident.  In 2009, in response to a direct query from Gordon, Defendant Kerstein relayed that, at that time, he was "one of the owners of the building."   They may be served at The Fairfax.

7.   Defendants John Doe #1 through John Doe #10 are any other entities or individuals, including but not limited to outside investors, who own and operate The Fairfax, or who are officers who assist, directly or indirectly, in its day-to-day operations.

## JURSIDCTION AND VENUE

8.  Subject-matter jurisdiction is conferred by 28 USC §1331, a federal question under the Fair Labor Standards Act, 29 USC §201-219, particularly 29 USC §216(b), and the Fair Housing Act, 42 USC §§3601-3631.  Supplemental jurisdiction is conferred over all state-law claims.

9.  Personal jurisdiction is conferred over all parties, as they are all domiciled, reside, or regularly conduct business at the Fairfax Apartments, in Philadelphia, Pennsylvania.

10.   Venue is proper for the reasons outlined in paragraph 8 above.

## NATURE OF ACTION/PROCEDURAL HISTORY

11.   This is a group action with common underlying facts, primarily for unpaid wages and/or unpaid overtime under the FLSA, and the PWCL, but the events which give rise to those claims also give the Plaintiffs standing to make several other claims for relief, as detailed herein, most notably relating to their "lease" agreement that in reality was a *Company Store* lease to which Plaintiff Walter Parker's employment was tied, an arrangement involuntarily inherited.

12.   Most facts are not in dispute, as evidenced by Defendants' motion to dismiss, itself rendered moot (beyond its admissions by Defendants) by this amended complaint.

## BACKGROUND

13.   Plaintiffs incorporate by reference, as if stated verbatim herein, the entire contents of all previous paragraphs.

14.   The Fairfax front desk ("The Desk") is a concierge-like station which serves as the 249-unit former hotel's communications hub, for tenants, staff, visitors, contractors, and first responders. It is staffed at all times by attendants who work in shifts of varying length. One of the attendants serves as the "desk manager," with ultimate responsibility for scheduling, covering for absent or late workers, tracking hours, and submitting the final payroll to the general manager, currently Defendant Gary Kerstein, to whom Walt reported directly at all times.

### 1988-1993

15.   In 1988, the Plaintiffs were hired by their late mother, Ms. Penny Parker, for the evening and overnight shifts at The Desk. Ms. Parker had been made "manager" with the idea that her two sons would assist her in the smooth overall running of The Desk.

16.   Through the end of 1992, in exchange for her duties as Desk "manager," Ms. Parker was paid $145.00 biweekly. *This pay was not tied in any way to overtime work at The Desk,* as retroactively claimed by Defendants for Plaintiff Walter Parker's overtime, since Ms. Parker never (or rarely) worked more than forty hours in a week at the desk. In early 1993, Ms. Parker and Defendant Fairfax Apartments Associates agreed to have her rent reduced from $600.00 to $286.00 per month (a nontaxable benefit), at which point her "manager's" check was eliminated.

### 1993-2007

17.   From 1993-1998, The Plaintiffs continued to work their Desk shifts, with Gordon constructively terminated (forced resignation) in October, 1998 under a false pretext, on the orders of nonparty UPenn, who threatened to "blacklist" Defendants if they allowed Gordon to

work behind the Desk. Defendants, in turn, threatened to fire Plaintiff's aging mother and disabled brother, if he defended any of his rights.

18.    From 1998-2007, Walt and the late Ms. Parker continued working their shifts, with Ms. Parker functioning as desk "manager," and Walt her assistant, with Gordon no longer involved with the desk, save for a one-week "emergency" fill-in stint in early 2006, after which Gordon was informed by Ms. Parker that she was still under orders from Defendants not to hire him, or that she and Walt would be fired, with all three of them evicted.

19.    On July 26, 2007, Ms. Parker died. She was replaced as desk "manager" by Walt, who was replaced formally as assistant desk manager by no one, but informally by Gordon, who also assumed the caregiver role Ms. Parker also played for Walt.[2]

## 2007-2016: House Slaves (Unpaid On-Call Time)

20.    From 2007-2016, Plaintiffs were treated like *Helots*, both figuratively and literally, expected to provide full coverage for The Desk, with Gordon called into action anytime Walt was unavailable, or sleeping, usually to answer a phone call or e-mail as a "message taker." On several occasions, Gordon was also required to briefly station himself near the desk to cover an absent or late worker, when Walt was unavailable.

21.    Alternative to paragraph 20 above, the Plaintiffs aver, that if Gordon was not on-call in Walt's stead, that Walt was in fact "on call" literally "24/7/365," or at all times, the duties for which his late mother was given the nontaxable benefit of reduced rent.

---

[2] Gordon's role in Walt's life is the functional equivalent of a *treatment support specialist* (TSS), a kind of "seeing eye human" and "babysitter" whose work generally remains hidden, though not to Defendants in this case, to best enable a disabled worker or student to function. Upon Ms. Parker's death, this role was involuntarily assigned to Gordon, who has spent the past nine years preparing Walt for truly independent living, in the event Gordon could no longer function as his TSS.

5

22.    While Walt was free to conduct *some* personal business during his on-call time, logistically he was on a "short leash," perpetually "chained" to the Desk, insofar as he (or Gordon, in his absence) had to be available at all times to deal with any time-sensitive issues as they arose, often on short or no notice.

23.    While it may be true that, at most given moments in time, the impact of his on-call duties on Walt's "personal time" should be obvious:

a.    Being on-call at all times restricted Walt's ability to vacation, travel, or even to take a single of his *forty-eight* (48) unused personal days since 2007.[3]

b.    As a practical matter, due to no reliable desk coverage in the event of an absence, Walt would routinely adjust his sleeping schedule to account for likely absences in situations where he would have to cover himself, such as sleeping until 11:30 p.m. in anticipation of having to work a "double" shift without notice if the daytime Desk worker did not show.

c.    The short-notice and no-notice nature of Walt's on-call duties were such that both Plaintiffs (they are mutual caregivers and mutually disabled) were *required* to live in an expensive building for which they had no use, "leasing" an overpriced code-violating, rodent-infested, apartment in structurally unsound[4] building from the *Company Store*:



---

[3] Walt, finally with time to visit a doctor, learned of previously undiagnosed chronic conditions which, had they remained undetected, would have seriously impacted his physical well-being even more than they have.
[4] In the 1980s, rainstorms collapsed the rooftop above apartments 804, 906, and 921, the second destroying the Plaintiffs' old apartment, #806, in which numerous large, heavy pieces from the ceiling had fallen over the years, including one which barely missed Plaintiff Gordon Roy Parker in his bathtub. Pieces from the ceiling will be filed with the court in a supplemental pleading/exhibit.

6

24.   Plaintiffs were forced to switch apartments in 2008 (the old apartment now rents for

$250.00 more), and forced to remain ever since, in what amounts to an illegal, $700.00

(according to Defendants, though the new "full" rent reflects a $550.00 rebate instead), a

monthly *wage kickback* from Walt's "overtime compensation," which, taken at face value,

leaves no consideration for Walt's time spent perpetually on-call, or Gordon's time spent in his

stead, ensuring Walt would get the occasional breather for discretionary activities, such as sleep.

### Unpaid Desk Overtime

25.   In the Complaint, Plaintiff Walter Parker offered a summary of unpaid overtime:

| Year | Base Pay | Scheduled Overtime | | | Unscheduled Overtime | | | Remarks |
|------|----------|-------|--------|------|--------|--------|--------|---------|
| | | Extra Hours | Amount Unpaid | Base Pay | Extra Hours | Amount Unpaid | | |
| Pre-2007 | variable | variable | variable | variable | variable | variable | |
| 2007 | 9.00 | 975* | $4,387.50 | $7.50 | 150* | $  562.50 | |
| 2008 | 9.00 | 832 | 3,312.00 | 7.50 | 150* | 562.50 | |
| 2009 | 9.00 | 832 | 3,312.00 | 7.50 | 126 | 472.50 | |
| 2010 | 9.00 | 832 | 3,312.00 | 7.50 | 245 | 968.75 | |
| 2011 | 9.00 | 832 | 3,312.00 | 7.50 | 230.50 | 864.375 | |
| 2012 | 9.00 | 832 | 3,312.00 | 8.50 | 335.50 | 1,425.875 | |
| 2013 | 9.00 | 832 | 3,744.00 | 8.50 | 444 | 3,774.00 | |
| 2014 | 9.00 | 832 | 3,744.00 | 8.50 | 438 | 1,861.50 | |
| 2015 | 9.00 | 48 | 216.00 | 8.50 | 6 | 27.00 | |
| 2015 | 9.75 | 784 | 3,578.00 | 9.25 | 203 | 938.875 | |
| 2016 | 9.75 | 136 | 663.00 | 9.25 | 47 | 217.375 | |
| **Subtotals** | | | **32,892.50** | | | **11,675.25** | |
| **GRAND TOTAL** | | | | | | **$44,567.50** | |

26.   With Plaintiffs' concerns about "oversharing" the workweek-specific details assuaged

by Defendant's request for more detail, he will now provide these specifics, while noting that his

previous averments of working fifty-six (or seven) scheduled hours per week without paid

overtime, and without even a day off between 2008-2016 should have been sufficient:[5]

---

[5] The "workweek" as defined here will be Monday-Sunday due to Defendants' use of a biweekly "pay period' that does not track hours worked during individual workweeks.

7

a.    For the week ending February 28, 2016, Walt worked fifty-six (56) scheduled hours, and six (6) unscheduled hours, or sixty-two (62) total hours. [6]

b.    For the week ending February 21, 2016, Walt worked fifty-six (56) scheduled hours, and five (5) unscheduled hours, or sixty-one (61) total hours.

c.    For the week ending February 14, 2016, Walt worked fifty-six (56) scheduled hours, and eight (8) unscheduled hours, or sixty-four (64) total hours.

d.    For the week ending February 07, 2016, Walt worked fifty-six (56) scheduled hours, and twelve and one-half (12.5) unscheduled hours, or sixty-eight and one-half (68.5) total hours.

e.    For the week ending January 31, 2016, Walt worked fifty-six (56) scheduled hours, and four and one-half (4.5) unscheduled hours, or sixty and one-half (60.5) total hours.

f.    For the week ending January 24, 2016, Walt worked fifty-six (56) scheduled hours, and two and one-half (2.5) unscheduled hours, or fifty-eight and one-half (58.5) total hours.

g.    For the week ending January 17, 2016, Walt worked fifty-six (56) scheduled hours, and four (4) unscheduled hours, or sixty (60) total hours.

h.    For the week ending January 10, 2016, Walt worked fifty-six (56) scheduled hours, and one-half (0.5) unscheduled hours, fifty-six and one-half (56.5) total hours.

i.    For the week ending January 03, 2016, Walt worked fifty-six (56) scheduled hours, and one and one-half (1.5) unscheduled hours, or fifty-seven and one half (57.5) total hours.

---

[6] Attached as Exhibit A is the relevant payroll data e-mailed from Walt to Defendant Kerstein, who was responsible at all times in controversy for preparing and sending it to a third-party payroll-processing company.

8

j.   For the week ending December 27, 2015, Walt worked fifty-six (56) scheduled hours, and one (1) unscheduled hour, or fifty-seven (57) total hours.

k.   For the week ending December 20, 2015, Walt worked fifty-six (56) scheduled hours, one (1) unscheduled hour, or fifty-seven (57) total hours.

l.   For the week ending December 13, 2015, Walt worked fifty-six (56) scheduled hours, and zero (0) unscheduled hours, or fifty-six (56) total hours.

m.   For the week ending December 06, 2015, Walt worked fifty-six (56) scheduled hours, and zero (0) unscheduled hours, or fifty-six (56) total hours.

n.   For the week ending November 29, 2015, Walt worked fifty-six (56) scheduled hours, and four (4) unscheduled hours, or sixty (60) total hours.

o.   For the week ending November 22, 2015, Walt worked fifty-six (56) scheduled hours, and one (1) unscheduled hour, or fifty-seven (57) total hours.

p.   For the week ending November 15, 2015, Walt worked fifty-six (56) scheduled hours, and two (2) unscheduled hours, or fifty-eight (58) total hours.

q.   For the week ending November 08, 2015, Walt worked fifty-six (56) scheduled hours, and five and one-half (5.5) unscheduled hours, or sixty-one and one-half (61.5) total hours.

r.   For the week ending November 01, 2015, Walt worked fifty-seven (57) scheduled hours, and zero (0) unscheduled hours, or fifty-seven (57) total hours.

s.   For the week ending October 25, 2015, Walt worked fifty-six (56) scheduled hours, and three (3) unscheduled hours, or fifty-nine (59) total hours.

t.   For the week ending October 18, 2015, Walt worked fifty-six (56) scheduled hours, and three (3) unscheduled hours, or fifty-nine (59) total hours.

u.    For the week ending October 11, 2015, Walt worked fifty-six (56) scheduled hours, and four (4) unscheduled hours, or sixty (60) total hours.

v.    For the week ending October 04, 2015, Walt worked fifty-six (56) scheduled hours, and four (4) unscheduled hours, or sixty (60) total hours.

w.    For the week ending September 27, 2015, Walt worked fifty-six (56) scheduled hours, and twelve (12) unscheduled hours, or sixty-eight (68) total hours.

x.    For the week ending September 20, 2015, Walt worked fifty-six (56) scheduled hours, and seven and one-half (7.5) unscheduled hours, or sixty-three and one-half (63.5) total hours.

y.    For the week ending September 13, 2015, Walt worked fifty-six (56) scheduled hours, and one (1) unscheduled hour, or fifty-seven (57) total hours.

z.    For the week ending September 06, 2015, Walt worked fifty-six (56) scheduled hours, and one (1) unscheduled hour, or fifty-seven (57) total hours.

aa.    For the week ending August 30, 2015, Walt worked fifty-six (56) scheduled hours, and zero (0) unscheduled hours, or fifty-six (56) total hours.

ab.    For the week ending August 23, 2015, Walt worked fifty-six (56) scheduled hours, and three (3) unscheduled hours, or fifty-nine (59) total hours.

ac.    ...*and so on, and so on, and so on*...the annual summary hereinabove reflects the total amounts of unpaid overtime, aggregated from 2007-2016.

### The Phantom "Rent Abatement"

27.    Defendants, in extensive correspondence with Walt, made clear their position that an alleged "$700.00 monthly rent abatement" (based on an imputed full rent of $1,150.00 a month, or $150.00 more than the actual amount of the full rent Defendants did notify Plaintiffs that they

10

intend to charge effective September 1, 2016) somehow compensates Walt for any unpaid Desk overtime, with no consideration at all for his and Gordon's on-call time. By contrast, Plaintiffs' late mother received the discounted rent without ever working overtime at the Desk.

28.    Plaintiffs aver that their residency in The Fairfax, after their mother died, was for the sole and exclusive benefit of Defendants. Were Walt not required to be perpetually on-call, he could have obtained housing at a comparable price to the actual rent he was paying, well within commuting distance. Moreover, were he properly paid the overtime he now claims he is due, he could easily have purchased a home or apartment, for which the HOA fee would not exceed what he was paying to live in the Company Store.

29.    Plaintiffs aver that the actual value of the apartment in which they reside was further reduced by its degraded condition, the specifics of which are not yet necessary, while averring further that their status as building employees made them something far less than the full-paying tenants depicted by Defendants, for reasons which include, but are not limited to, their treatment by building staff and executives, and sometimes tenants.[7]

30.    With no actual rent abatement, Walt (and Gordon when in his stead) is left uncompensated for his years-long, 24/7/365 coverage of the Desk, work Defendants themselves have noted they "valued," and he is left without proper compensation for his overtime.

## COUNT ONE: FLSA VIOLATIONS
### (Unpaid Overtime, Walter Parker vs. All Defendants)

31.    Plaintiffs incorporate by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs.

---

[7] Gordon was terminated from the Desk in 1998 over conduct which occurred during his personal time, underscoring his status as a resident in employee housing, rather than a full-paying tenant.

32.    The period in controversy in this lawsuit runs from July 26, 2007, when Penny Parker died, through the present.

33.    During all times in controversy, Plaintiff Walter Parker ("Walt") was an employee of Defendants, as defined by the FLSA, 29 USC §203(e)(1). Specifically, he was an hourly shift worker at The Desk.

34.    During all times in controversy, all Defendants were Walt's employer, as defined by the FLSA, 29 USC §203(d)(1), because:

a.    Defendant Fairfax Apartments Associates is the direct owner and operator of The Fairfax, for whom Walt (and Gordon) worked, and the company whose name appears upon the paychecks of The Fairfax staff, including front desk staff.

b.    Defendant 4247 FX is listed on the official Secretary Of State website as the sole officer and "general partner" of Defendant Fairfax Apartments Associates, and Plaintiff's employer as defined by the FLSA because it is acting indirectly and/or directly in the interest of Defendant Fairfax Apartments Associates.

c.    Defendant Joyce Prentis is listed on the official Secretary of State website as an officer (treasurer) of Defendant 4247 FX, and Walt's employer as defined by the FLSA because she is acting in/directly in the interest of Defendant Fairfax Apartments Associates.



$1,250/mo. Ad For Plaintiffs' Old Apartment #806: "*Placed by Joyce or Gary.*"[8]

---

[8] *Alan H. Klein Properties* is listed on the Secretary Of State website as an inactive, consolidated corporation.

12

d.     Defendant Gary Kerstein is the general manager of The Fairfax (in 2009, he claimed to Plaintiff Gordon Roy Parker that he was "one of the owners of the building), the "boss" to whom its employees, including Walt and all front desk staff, ultimately report, and the man who is unequivocally "in charge" of The Fairfax.[9]  He is unequivocally Plaintiff's employer as defined by the FLSA, as he is acting indirectly and/or directly in the interest of Defendant Fairfax Apartments Associates.  It was this Defendant who gave the direct order not to rehire Gordon at The Desk in 2006, resulting in Ms. Parker working until just prior to her death.

e.     Defendant Alan H. Klein, the original owner of The Fairfax, is listed on the official Secretary of State website as the President of Defendant 4247 FX, the latter the sole officer of Defendant Fairfax Apartments Associates.  As the Klein family patriarch, Defendant Klein is Plaintiff's employer as defined by the FLSA because he is acting indirectly and/or directly in the interest of Defendant Fairfax Apartments Associates.

f.     Defendant Marla Klein Kerstein is Defendant Gary Kerstein's wife, the daughter of Defendant Alan H. Klein, and an executive at The Fairfax, who is Plaintiff's employer as defined by the FLSA because she is acting indirectly and/or directly in the interest of Defendant Fairfax Apartments Associates.  Specifically, Ms. Kerstein's duties seem equivalent to that of her husband; combined, they "run" The Fairfax.  While most contact from superiors relating to Fairfax matters would come from Gary, the occasional contact, including the harassing pounding on Plaintiffs' door and telephone call subsequent to the February 29, 2016 events, was directed solely by her.

---

[9] In Defendants' motion to dismiss the first lawsuit, the declaration of Gary Kerstein states that he is not employed by *4247 FX*, which may be technically true, but which also in no way renders his extremely visible, well-documented position atop The Fairfax's organizational chart – a position shared with his wife, Defendant Marla Klein Kerstein – nonexistent.  During all times in controversy in this action, Mr. Kerstein was Walt's "boss" and both Plaintiffs' "landlord," as those roles are commonly defined by reasonable folk.

g.    Defendant Does #1-10 are any officer, manager, executive, investor, or business or other entity which either owns and operates the Fairfax, but who was omitted from being named here due to improper paperwork, cloaking, or other harmless omission, are employers as defined by the FLSA.

35.   Regarding the many exemptions to the mandatory overtime provisions of the FLSA, none of them apply to either Plaintiff, who are (or would be) nonexempt hourly workers.

36.   As set forth in paragraph 26 above, Walt worked more than forty hours in each and every week from July 26, 2007 thru February 29, 2016, for a minimum total of hours each and every week of fifty-six scheduled, plus any unscheduled "on-call" overtime at The Desk itself.

37.   When confronted internally with Walt's unpaid-overtime complaint, Defendants, via their counsel, disclaimed any money owed, on the grounds that the phantom "rent abatement" was full compensation for the hours worked. As noted, Plaintiff's late mother received the same abatement for scheduling, paperwork, and for being on-call as the last resort to cover an absent or late worker.

38.   Walt avers, based on paragraphs 25-27 above, that Defendants' refusal to pay overtime for Desk shift work was wanton, willful, and completely intentional, and engaged in directly by Defendant Gary Kerstein, with the explicit approval of all Defendants.

39.   Walt avers that, prior to February 29, 2016, the applicable three-year statute of limitations under the FLSA was tolled through February 29, 2016, because he had been threatened with retaliation and has endured actual retaliation from Defendants.[10]

---

[10] In May, 2008, during a phone call which awoke Gordon on one hour of sleep, Defendant Gary Kerstein remarked that Gordon "likes to sue people," and that Walt was "*lucky he has a job and a place to live.*" Secondary to his disability, Walt was routinely treated as a subordinate, even by those he technically "managed." Numerous times since, Defendants have made clear to Plaintiff that they should never complain about anything.

14

40. Under the overtime provision of the FLSA, 29 USC §207(a)(1), Plaintiff is entitled to "time-and-a-half" pay for each hour at The Desk over forty worked in a given week during the period in controversy, for a total of $44,567.50 in unpaid shift overtime, dating back to 2007, as set forth by summary in paragraph 26, and in the "requested" detail in paragraph 27.

41. Plaintiff Walter Parker avers that Defendants' conduct, as set forth hereinabove, constitutes a violation of the FLSA, 29 USC §207(a)(1) as set forth hereinabove. Those two violations further constitute a violation of 29 USC 215(a)(2), and gives the Plaintiffs standing to file suit under 29 USC §216(b)(1); he state this claim for relief on that basis. Relief includes:

    a. Compensatory damages for unpaid wages in an amount to be determined at trial, but which is not less than the actual unpaid wages, believed to be FORTY-FOUR THOUSAND, FIVE-HUNDRED SIXTY-SEVEN DOLLARS AND FIFTY CENTS ($44,567.50 US).

    b. Additional liquidated damages in an amount equal to the unpaid wages set forth in subparagraph a) above.

    c. Costs of suit, including reasonable attorney fees.[11]

    d. Such other relief as this court deems just and proper to make Plaintiff whole.

**COUNT TWO:**
**FLSA VIOLATIONS (On-Call Time)**
**(All Plaintiffs vs. All Defendants)**

42. Plaintiffs incorporate by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs, particularly Count One above, specifically noted here for restatement of the FLSA-covered employment relationship between the parties.

---

[11] Defendants' motion to dismiss the original complaint flat-out accuses Plaintiff Walter Parker of seeking attorney fees on behalf of co-Plaintiff Gordon Roy Parker, which is not the case. Aside from 29 USC §216(b) *allowing* a Plaintiff to bring suit on behalf of other employees in the first place (with their written consent, which Walt's signature and filing on his own accord, constitutes), this case has been "shopped" to numerous attorneys, for whom any recovered fees would be given. Attorneys have expressed interest in representation, but this has been made less affordable by Defendants' brazen attempt to starve Plaintiffs, who are each acting on their own accord.

43.   Unless this Court finds that Plaintiff Walter Parker was on-call literally every hour of every day, including when sleeping or otherwise indisposed, both Plaintiffs collectively fulfilled the duties for which Ms. Parker, as "desk manager," was compensated for with twenty-nine paid hours during each biweekly pay period.  Based on this precedent, it should be presumed that the value of the on-call duties is equivalent to twenty-nine hours at the regular hourly desk rate.

44.   For the workweek ending February 28, 2016, Plaintiffs' on-call time equated to fourteen-and-a-half (14.5) paid hours of labor, to be properly apportioned between them at trial.

45.   For all preceding workweeks dating back to July, 2007, the two Plaintiffs have combined to fulfill the on-call duties, with the aggregate of 14.5 unpaid hours per week between them, or an approximate total of over 6,000 unpaid hours of on-call time.

## Plaintiff Walter Parker's Unpaid Hours And Unpaid Overtime

46.   Because Walt was already working more than forty (40) hours for each and every workweek, any on-call time apportioned to him from the 6,000+ unpaid hours is also unpaid overtime.

47.   Because Gordon was not paid at all for his on-call time, any such time apportioned to him (such as when Walt was sleeping), should have been paid at no less than the prevailing minimum wage of $7.25 an hour, or at no less than the minimum hourly desk wage of $9.25 an hour, for the day shift.

## The Phantom $700.00 "Rent Abatement"

48.   Upon her death in July 2007, Plaintiff(s) took over the on-call duties for which Penny Parker agreed to perform in exchange for *her* rent being reduced, initially from $600.00 to $286.00, where it remained when she died, and when the Plaintiffs took over the apartment and/or her on-call duties (with Gordon standing in stead for Walt as needed).  By then, the

16

market rent for apartment #806 had increased to $950.00, close to the $700.00 claimed by Defendants as an "abatement."

49.    In February, 2008, Defendants demanded that Plaintiffs switch apartments, and they were moved to their current apartment, #119, one of the least desirable in the building. Once there, they noticed numerous code deficiencies in the apartment,[12] many of which persist today, but were not permitted to change apartments after that, as a regular tenant paying full rent would.

50.    While this alleged "rent abatement" might have been of value to the late Penny Parker, it was of absolutely **no** value to Plaintiffs, who could easily have lived elsewhere at a rent (or HOA fee) comparable to the $450.00 they were paying to live near The Desk (about as near as physically possible, in fact) at Defendants' convenience.

51.    *You cannot spend money in two places at once*, yet Defendants are attempting this very sleight-of-hand: even if the "abatement" had value, that value was "spent" offsetting the overtime shift work, leaving the on-call time (for which Ms. Parker was paid for 14.5 hours a week, without ever working overtime at The Desk) uncompensated. This, of course, is also moot, since the "abatement" has no value.[13]

52.    Plaintiffs further aver that, in this specific case, their treatment as employees made it literally impossible for them to enjoy life in The Fairfax as regular, full-paying tenants.

---

[12] The Fairfax has numerous severe internal and external structural deficiencies, several of which impacted Plaintiff's old apartment, #806. In 1986 and 1988, apartments #904 and #906 were sequentially flooded by rainstorms which took out the building roof directly overhead, with the latter flood permanently damaging #806, leading to roach infestations and falling interior pieces from the ceiling (extremely heavy rock/marble, one piece of which almost struck Plaintiff in his bathtub). Apartment #119 has horrible pipes (feces once turned up in the bathtub), is directly over the boiler (Plaintiffs have been blamed for buckled floors not caused by them), and, since 2014, and as recently as a few months ago, Plaintiffs have slaughtered twenty-seven mice in their kitchen.
[13] Simple math reveals that, had Plaintiff been paid time-and-a-half for his scheduled overtime shifts, and commuted from a place with equal rent, he would have netted several thousands of dollars a year, without having to "babysit" The Desk 24/7/365. The wage laws forbid employees from entering into any agreement which would leave them worse off than with straight wages or time-and-a-half.

53.   Because neither Plaintiff was compensated at all for on-call time, under the FLSA, 29 USC §206(a)(1), each is entitled to the statutory minimum wage (or the desk hourly wage of $9.25) for their proportionate share of the 6,000+ hours of pay due them for this work.

54.   Because his scheduled workweek was already longer than forty hours, under the FLSA, 29 USC §207(a)(1), for his contribution to the on-call Desk "manager" duties during all times in controversy, Plaintiff Walter Parker is entitled to wages at time-and-a-half for his share of these 6,000+ paid hours.

55.   Plaintiffs aver that Defendants' conduct as set forth hereinabove constitutes violations of the FLSA, 29 USC §206(a)(1), and 29 USC §207(a)(1).  Those two violations further constitute a violation of 29 USC 215(a)(2), and gives the Plaintiffs standing to file suit under 29 USC §216(b)(1); they state this claim for relief on that basis.  This relief includes:

a.   Unpaid wages for both Plaintiffs, and unpaid overtime for Plaintiff Walter Parker, in an amount to be determined by apportionment, but which is not less than FORTY-FIVE THOUSAND DOLLARS ($45,000.00 US), and which increases in proportion to the hours credited to Plaintiff Walter Parker.

b.   Liquidated damages in an amount equal to the amount in subparagraph a) above.

c.   Costs of suit, including reasonable *outside* attorney fees.

d.   Such other relief as this court deems just and proper to make Plaintiff whole.

**COUNT THREE:**
**RETALIATION UNDER THE FLSA**
**(All Plaintiffs Against All Defendants)**

56.   Plaintiffs incorporate by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs, particularly Count One, specifically noted here for restatement of the FLSA-covered employment relationship between the parties.

57.   Even on February 29, 2016, when Plaintiff Walter Parker was forced to take indefinite leave from The Desk for an unrelated reason, Defendants had yet to be put on notice of the wage complaint, because they had feared and/or been threatened with retaliation were they to complain previously, a concern rendered moot by these events.

58.   Since March 1, 2016, when Defendants were put on notice of the unpaid-wage allegations, they have retaliated against the Plaintiffs in numerous ways, including, but in no way limited to:

a.   Constructively terminating Plaintiff Walter Parker from his shift work at the desk (by refusing to allow his return), using the pretext of his self-reported disability (via a withdrawn ADA request once the risk to his safety abated), and a twice-moved goalpost that ignored two separate medical clearances by Walt, who, aside from never having done anything wrong in the first place, has, without incident, continued to interact with tenants (some of whom mistakenly believe he is still employed at The Fairfax), interviewed for multiple jobs, and even been hired to work, all indications that he is perfectly capable of performing what was rightfully his Desk job.

b.   Even without the self-reported disability, immediately upon his raising the wage concerns, Plaintiff Walter Parker's manager's position was either abolished, or given to someone else, with the rent on Plaintiffs' apartment raised to $1,000.00, effective September 1, 2016.

c.   Prior to the wage concerns being raised, ***Defendants had never claimed that the rent would be applied to Plaintiff Walter Parker's overtime at the desk***, or that the rent would be more than the $450.00 a month stated in the "lease." Plaintiffs aver that this constitutes an attempted constructive eviction via undue economic pressure.

d.   Repeatedly abusing process via their attorney, who, despite its projections to the contrary, is the one using Plaintiff Walter Parker as a "pawn" against his brother, whose name

19

they injected into this case without provocation,[14] to further its own agenda and that of co-conspirator UPenn.[15]  The imputed assistance of Plaintiff Gordon Roy Parker in "orchestrating" this case (which he did not, though he has assisted with testimony and filed his own state claims) gives him standing to sue for retaliation.  Moreover, it was made clear repeatedly to defense counsel that their conduct towards Walter was, in Plaintiff Gordon Roy Parker's opinion, retaliatory against him for his own claims against Defendants, their counsel, and UPenn.

59.    Defendants' above-referenced retaliatory use of process against Plaintiff Walter Parker (indirectly retaliatory against his brother) is multipurpose, serving several mutual aims of theirs and their clients', including the ones set forth above, but also to deter other employees of Defendants *who are also due back and unpaid wages* from joining this lawsuit.[16]

60.    Defendant has also admitted to Plaintiffs in the past that there are outside investors in the Fairfax, whose identities they have gone to lengths to keep hidden.  In 2015, they sold Garden Court Plaza (4701 Pine) for $32 million to the Post Brothers, New York-based developers who are in tremendous, sometimes violent conflict with pro-union forces in Philadelphia.  For all its talk about tenant safety, this union strife is now literally at the doorstep of The Desk, something for which Plaintiff Walter Parker never signed on, and something which the "backdoor discovery" of a hostile medical examination (which Defendants briefly sought, also under pretext) could easily be used to flush out pro-union sentiment among Desk staff.

---

[14] The use of Gordon's name was a "parallel construction" allowing his internet stalkers to begin involving his family without appearing to be the aggressor, but instead having just come across one of his lawsuits.

[15] Since 2002, defense counsel has used process to impute severe mental illness and unemployability upon Plaintiff, while fully aware that UPenn was coercing Defendants into not hiring him at The Desk.

[16] Throughout all times in controversy in this lawsuit, Defendants have skirted the FLSA not just with the two Plaintiffs, but with the superintendent, who is the head of maintenance during the day, and his wife, who gets a paycheck for being part-time maintenance.  The husband *works in his wife's name* for the evening desk shifts, with his hours credited to her, specifically to avoid FLSA overtime liability, in an amount comparable to what is owed the Plaintiffs.  Like the Plaintiffs, this couple is "on call" at all times, and has the "abatement" of free rent on a larger apartment in the building.

61.   Plaintiffs aver that Defendants' conduct, as set forth hereinabove, violates the

retaliation provisions of the FLSA, 29 USC §218(a)(2), and 29 USC 218(c)(a)(1-5), and state

this claim for relief on that basis.  This relief includes:

a.   Reinstatement of both Plaintiffs to their respective positions at The Desk;

b.   Compensatory damages for lost wages, and any other pecuniary harm attributable

to the retaliation;

c.   Discretionary liquidated damages, in an amount to be determined at trial;

d.   The maximum punitive damages allowable by law;[17] and

e.   Such other relief this court deems just and proper to make Plaintiffs whole.

## COUNT FOUR:
## WPCL VIOLATIONS
### (All Plaintiffs Against All Defendants)

62.   Plaintiffs incorporate by reference, as if set forth verbatim herein, the entire contents

of all previous paragraphs.

63.   Plaintiffs aver that Defendants conduct, as set forth hereinabove, constitutes

simultaneous violations of the analogous Pennsylvania Wage Payment Collection Law (WPCL),

for unpaid overtime (Plaintiff Walter Parker), and for unpaid wages and retaliation (both

Plaintiffs).  This claim for relief is stated on that basis.

64.   Under the WPCL, with each workweek (as set forth in detail in paragraphs 25-26)

having gone over forty (40) hours, Plaintiffs are entitled to:

a.   Actual damages (the same lost wages claimed under the FLSA);

b.   Twenty-five percent liquidated damages;

---

[17] Defendants, in their motion to dismiss, claim that punitive damages are not available under the FLSA, but it appears the Third Circuit has yet to weigh in on either side of the circuit split.

c.    Alternatively, with each workweek constituting a separate violation against each

Plaintiff, they are each entitled to statutory damages of $500.00 per week, dating back over eight

years, for an amount to be determined at trial, which is not less than FOUR HUNDRED

THOUSAND DOLLARS ($400,000.00 US).

d.    Reinstatement to their jobs at The Desk;

e.    Costs of suit, including reasonable outside attorney fees;

f.    Such other relief as this court deems just and proper to make Plaintiff whole.

**COUNT FIVE:**
**BREACH OF CONTRACT**
**(All Plaintiffs Against All Defendants)**

65.   Plaintiffs incorporate by reference, as if set forth verbatim herein, the entire contents

of all previous paragraphs.

66.   Nowhere in Plaintiff's lease is it specified that the $450.00 monthly rent has any

"strings," let alone serving as wage compensation for Plaintiff Walter Parker's Desk overtime.

67.   Plaintiffs aver that in early March, 2016, when Defendants suddenly asserted that the

$450.00 monthly rent clearly stated in the lease was *retroactively* raised to $1,150.00, $700.00 of

which was directly and illegally "paid" by Plaintiff Walter Parker through the sweat of his labor,

to the "Company Store" Defendant Fairfax Apartments Associates.

68.   Plaintiffs aver that their status as employees degraded their treatment as full-paying

tenants, to where they were employee residents, or, more colorfully put, *house slaves*.

69.   Plaintiffs aver that, by allowing them to be internet-stalked to the point of having to

move for their own physical safety (the same reason Plaintiff Walter Parker had to take leave

from The Desk, exacerbated by defense counsel's *shoehorning* of Plaintiff Gordon Parker into

this action), Defendants breached the "lease" (residential contract) by denying Plaintiffs the quiet enjoyment to which full-paying tenants that they have been ***retconned[18]*** to be are entitled.

70.   Over the years, Defendants have displayed an open hostility towards Plaintiffs which completely destroyed any quiet enjoyment they could possibly have salvaged, in an environment where they could be ***summoned***, at any time, on short or no notice, and expected to serve, without protest or complaint.

71.   Since February 29, 2016, Plaintiff Gordon Roy Parker's "quiet enjoyment" of the premises has been restricted to remaining in the apartment almost at all times, to avoid any potential for conflict with building workers who have a long history of harassing him (and twice physically assaulting him), even in the absence of litigation, their cue taken from Defendants.

72.   Finally, the lease itself is not valid, as it was entered into under duress and coercion.

73.   As a direct and proximate result of Defendants' wanton, willful, and intentional violation of the terms of their "lease," Plaintiffs have suffered a degradation in the value received for all rents paid, during all times in controversy.

74.   Plaintiffs aver that Defendants' conduct, as set forth above, constitutes a willful, wanton, intentional violation of the Pennsylvania tort of breach of contract of their "lease," and state this claim for relief on that basis.  This relief includes:

      a.     Compensatory damages, in an amount to be determined at trial;

      b.     Restoration of their lease to its prior state;

      c.     Costs of suit; and

      d.     Such other relief as this court deems just and proper to make Plaintiffs whole.

---

[18] Google defines ***retcon*** as "[to] revise (an aspect of a fictional work) retrospectively, typically by introducing a piece of new information that imposes a different interpretation on previously described events. "I think fans get more upset when characters act blatantly out of established type, or when things get retconned,"

## COUNT SIX:
## FRAUDULENT OR NEGLIGENT MISREPRESENTATION
### (All Plaintiffs Against All Defendants)

75.    Plaintiffs incorporate by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs.

76.    During all times in controversy, tolled by coercion and retaliation, or the threat of same, Defendants have made egregious, multiple fraudulent (or, alternatively, negligent) misrepresentations to Plaintiffs, their reliance upon which has caused substantial pecuniary harm. This includes, but is in no way limited to:

a.    Knowingly misrepresenting to both Plaintiffs the rental suitability of both apartments 806 and 119, concealing multiple code deficiencies in each apartment, yet requiring the Plaintiffs to rent both from them, and these specific apartments, under threat of job termination and eviction.

b.    Misrepresenting to Plaintiff Gordon Roy Parker the amount of the monthly rent on the "lease" as $450.00, but then later claiming that this was merely a *fraction* of the rent, and that it had nothing to do with the Plaintiffs' on-call time to which it had previously been tied.[19] Had Plaintiff been properly notified of this, he would have "cut bait" in 2015 when he received his back-pay disbursement of over $12,000.00, and made a down payment on a house or condo, rather than sinking the money back into The Fairfax, via a back-rent remittance to his brother, which he thought would ensure his continued tenancy at the $450.00 rent..

c.    Misrepresenting to both Plaintiffs, in correspondence from March 2016, from their counsel, that the "full" rent on their apartment #119 was $1,150.00 a month, when the

---

[19] Plaintiff Gordon Roy Parker's opinion of his experience as a resident of an "endearing" employee-housing apartment whose total rent is $450.00 a month is not going to match that of a full-priced apartment at $1,150.00 a month, reduced to $1,000.00 a month when Defendants attempted to charge actual cash instead of an involuntary exchange for indentured servitude.

24

actual "full" rent they are now attempting to charge Plaintiffs is lower, at $1,000.00 a month, indicating, by their own admission, that Plaintiffs have overpaid their rent by at least $150.00 a month during all times in controversy.

        d.    Knowingly misrepresenting to Plaintiff Walter Parker, upon initial notice of his leave of absence, that his job was secure and that he could return on June 1, 2016, resulting in the Plaintiffs not diverting their greater resources than the present to relocating, effectively "trapping" them in The Fairfax.[20]

        e.    Knowingly misrepresenting to Walt that he could return to his job upon obtaining medical clearance, which he did, twice, only to then be told that this was insufficient, and that he would still be "locked out" of his job.[21]  That Walt was approved for unemployment benefits makes this, legally speaking, either a "hostile quit" or a constructive termination.

77.    As a direct and proximate result of Defendants' conduct as set forth hereinabove, the Plaintiffs expended substantial resources on the deliberately misguided assumption that their income and rent would not have a "wrecking ball" taken to it by Defendants' very costly lies.

78.    Plaintiffs aver that Defendants' wanton, willful, and intentional conduct, as set forth hereinabove, constitutes a violation of the Pennsylvania tort of fraudulent misrepresentation, and states this claim for relief on that basis.  This relief to which they are entitled includes:

---

[20] This lawsuit itself is part of the "financial quarantine" of Plaintiff that has been defense counsel's goal since 2002, on behalf of its client, UPenn, and now its new client, The Fairfax.  In addition to cutting him off economically, they have turned their attention to "google-bombing" his brother in an attempt to derail *his* ability to find new work or living arrangements.  Of course, with the amounts Plaintiffs are rightfully owed, they could purchase luxury housing, and still have enough left over to enjoy a well-earned sabbatical.

[21] Unsatisfied with Walt's medical clearance, Defendant used the pretext to forward a whistleblowing e-mail from Walt which put his wage dispute "on blast" to defense counsel's other client, UPenn, since the letter was sent to the UPenn Health system, along with what was more of a backdoor deposition than a request for the simple medical clearance which the doctor had already provided.  Defense counsel has a long history of malicious use of medical-related legal process against Plaintiff Gordon Roy Parker.

    a.    Compensatory damages to restore what was lost to the fraud, including lost wages, overpayments of rent (either the $150.00 per month retroactive overpayment, the $700.00/month diverted from overtime wages, or the full rent of $450.00/month plus the $700.00/month rebate), in an amount to be determined at trial;

    b.    The maximum punitive damages allowable by law;

    c.    Costs of suit, including reasonable outside attorneys' fees;

    d.    Injunctive relief sufficient to terminate the actionable conduct; and

    e.    Such other relief as this court deems just and proper to make the Plaintiffs whole.

**COUNTS SEVEN AND EIGHT:**
**UNJUST ENRICHMENT AND CONVERSION**
**(All Parties Against All Defendants)**

79.  Plaintiffs incorporate by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs.

80.  Through their conduct as set forth hereinabove, during all times in controversy, Defendants have procured the financial benefit of $450.00 a month in cash rent payments from Plaintiffs, and – until a Court says otherwise – another $700.00 a month "rent abatement" which they have used to justify denying the Plaintiffs their rightly-earned wages by assuming the role of *Company Landlord*.

81.  The British roots of American law against *wage kickbacks,* the category into which Plaintiffs' "lease" falls, explain the dire need to protect working stiffs from this oppression:

The old Truck enactments were very numerous and date from about the year 1464. The particular evil intended to be remedied was the truck system, or payment by masters of their men's wages wholly or in part with goods – a system open to various abuse – when workmen were forced to take goods at their master's valuation. The statutes were applied first to one branch of manufacture, and then in succession to others, as experience and the progress of manufactures dictated, until they embraced the whole or nearly the whole of the manufactures of England. They established the obligation, and produced, or at least fortified the custom, of uniformly paying the whole wages of artificers in the current coin of the realm.

From Wikipedia.org, retrieved July 3, 2016

82.   In addition to both Ms. Parker and Plaintiffs having been told many times over the years that any or all of them could not manage The Desk if they were not living in the Fairfax, the short-notice on-call requirements (without pay for preparation time for a replacement shift) makes commuting impractical, if not impossible.  The discounted rent's status as a nontaxable benefit further underscores its "tying" to employment, while its coercive nature, and extension of an agreement initially made by the late Penny Parker, underscore its involuntary nature, particularly since the "lease's" only alternative was homelessness and joblessness, as precursors to the inevitable government rescue to solve what should never have been a problem to start.

83.   While Plaintiffs reserve the right to argue the right to a rent rebate for failure to perform the "lease," or on other grounds, they are willing to assume, for the purposes of this lawsuit, that the $450.00 in rent they paid each month was "just," in that it approximates (but is still greater than) the "HOA fee" or maintenance cost for the rental, but only to the extent that it was the *full* rent, and not part of a larger equation involving barter or other exchange for labor.

84.   For the purposes of this claim, Defendants have – retroactively and going forward – *converted* Plaintiffs' property, in this case their unpaid wages and overtime, into profits for themselves, based on an invalid, coerced "lease" with a phantom "rent abatement."

85.   Because Defendants have already admitted that the unpaid Desk shift overtime from Plaintiff Walt was applied to his rent, that overtime pay is now cash or a cash equivalent which was "laundered" through Defendants, and is therefore already in Defendants' possession, wholly separate from the underlying wage claim, as Defendant has already admitted that it was paid to Plaintiff(s) before its redirection to Defendants' coffers.  These two counts, by contrast, addresses the validity of the underlying "lease," and its function as a truck system or kickback.

86. Plaintiffs aver that Defendants' conduct, as set forth hereinabove, including but not limited to tying the lease to Plaintiff Walter Parker's employment, constitutes an egregious, wanton, willful, ongoing, and economically life-altering violation of the Pennsylvania tort of *unjust enrichment*, and states this claim for relief for Count Seven on that basis.

87. Plaintiffs aver that Defendants' conduct, as set forth hereinabove, specifically the commandeering of the Plaintiffs' unpaid wages and overtime, constitutes an identical violation of the Pennsylvania tort of *conversion*, stating the claim for relief for Count Eight on that basis. The relief sought for both counts, or either count individually, includes:

    a.    Compensatory damages in the amount of the enrichment, in an amount to be determined at trial, but not less than FIFTY-SIX THOUSAND DOLLARS ($56,000.00 US);

    b.    The maximum punitive damages allowable by law (if applicable);

    c.    Injunctive relief sufficient to terminate the actionable conduct, including prohibiting any alteration of the $450.00 rent, at least pending outcome of this litigation.

    d.    Costs of suit.

    e.    Such other relief as this court deems just and proper to make Plaintiffs whole.

## COUNT NINE:
## VIOLATIONS OF THE FAIR HOUSING ACT
### (All Plaintiffs Against All Defendants)

88. Plaintiffs incorporate by reference, as if set forth verbatim herein, the entire contents of all previous paragraphs.

89. But for the Plaintiffs' status as disabled individuals – exacerbated exponentially by Defendant's dual status as landlord and employer -- they would never have been subjected to any of the treatment set forth hereinabove, for they would have been able to combat it.  Specifically, the treatment includes, but is not limited to:

    a.    Treatment as employees, or even *serfs,* rather than as full-paying tenants, which the Plaintiffs were told they were only after the fact..[22]

    b.    *Human-trafficking* of Plaintiff Gordon Roy Parker, exploiting a reputation they and Defense counsel helped to cripple.  Knowing full well that Gordon was "trapped" both as his brother's caregiver (including during working hours), and as an unpaid assistant desk manager, the very people who convinced anyone who searches his name on the internet that he is "unemployable" were "employing" but not "paying" him.  Because this was performed based on their knowledge as his landlord (i.e., "he was home anyway"), his tenancy was degraded from that of tenant to "employee resident."

    c.    Offering no regular selection of apartments (instead offering the least desirable and least suitable), and requiring them to live in apartment 119, directly over the boiler room, with its many issues, which Defendans would often blame on Plaintiffs.

    d.    Allowing and *encouraging* internet harassment and threats against Plaintiff Gordon Roy Parker, in collusion with UPenn. [23]  The threats have been numerous, most recently including a "swatting" of Plaintiffs' apartment by individuals with indirect ties to defense counsel (hackers who work as "information security" for law firms, and find internet cases for a fee), repeated threats to trespass to commit violent acts in what should be a safe space, and the threats of February 29, 2016.

---

[22] On February 29, 2016, police were called to Plaintiffs' apartment due to a credible internet threat whose seeds were sown by both Defendants and their counsel, over a long period of time spent either directly violating their rights, or standing down in a manner which gives a "green light" to those who otherwise might face legal consequences for things like tortious interference related to threats to trespass or harm tenants, who Defendant have a *fiduciary duty* to protect.  To call Defendants even grossly negligent in this regard would be charitable.

[23] In 2002, UPenn, via current defense counsel, was suborning perjury in <u>Parker v. Wintermute</u>, by claiming it could not identify "Wintermute," a former female UPenn student (and the wife of another UPenn grad) Plaintiff was recently able to determine had made the death threats.  Like the threat of February 29, 2016, the 2001 threat from "Wintermute" involved a threat to *trespass*, giving The Fairfax standing to sue the stalkers, yet it chose instead to leave a major threat to its internet-compromised building unchecked.

90. Plaintiffs aver that Defendants' wanton, willful, malicious, intentional conduct, as set forth hereinabove, constitutes a violation of the Fair Housing Act, for discrimination on the bases of actual or perceived disability, and of retaliation for the Plaintiffs' having attempted to exercise their fair-housing rights. They state their claim for relief on this basis.

91. Under the Fair Housing Act, Plaintiffs are entitled to the following relief:

      a. Compensatory damages for any pecuniary losses, including but not limited to loss of income, loss of retirement benefits, loss of enjoyment of life, and pain and suffering.

      b. The maximum punitive damages allowed by law;

      c. Costs of suit, including reasonable outside attorney fees;

      d. Injunctive relief sufficient to terminate the actionable conduct; and

      e. Such other and further relief as this Court deems just and proper to make Plaintiffs whole.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, collectively and individually, seek the following relief:

1. Compensatory damages for lost wages and liquidated damages in an amount to be determined at trial, but which is not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000.00 US);

2. Punitive damages, in an amount to be determined at trial.

3. A declaration that Plaintiffs' lease is invalid, and that Defendants have never had the legal right to charge them more than its own cost (or a theoretical HOA fee) as rent.

4. A temporary and permanent injunction prohibiting retaliation against Plaintiffs;

5. Reinstatement of Plaintiffs to their previous Desk positions.

6. Such other relief as this Court deems proper to make the Plaintiffs whole.

This the 11th day of July, 2016.


_____
GORDON ROY PARKER, PRO SE
4247 Locust Street, #119
Philadelphia, PA  19104
snodgrasspublish@aol.com
(215) 382-2063 (changing soon)


_____
WALTER GRIGGS PARKER, Pro Se
4247 Locust Street, #119
Philadelphia, PA  19104
waltfx4247@aol.com
(267) 423-1405

# Exhibit A

**(Samples of Payrolls and E-mails noting payrolls were sent from August 2015-February 2016, complete version of this Exhibit is on Flash Drive)**

**From:** Waltfx4247 <waltfx4247@aol.com>

**To:** Garyk0123 <Garyk0123@aol.com>

**Subject:** Fairfax Desk Payroll for the period of July 22-August 4, 2015

**Date:** Wed, Aug 5, 2015 2:12 am

**Attachments:** Payroll July 22-August 4, 2015.pdf (23K)

Gary:

Attached is the Fairfax Desk payroll for the period of July 22-August 4.

I'm going to assume unless advised otherwise that you will need the next payroll on August 13 (next Thursday) as you noted earlier this week.

Walt

(Note: This is the first of the sample e-mails and payrolls that are part of Exhibit A). The full Exhibit A is on a flash drive).

# Fairfax Desk Payroll
# Pay Period: July 22-August 4, 2015

**Debbie Bassett**
   $9.25   72.00
   $9.75   _____
   $       _____
   $       _____

**Phylece King**
   $9.25   28.00
   $9.75   _____
   $       _____
   $       _____

**Tierra Hayes**
   $9.25   37.50
   $9.75   _____
   $       _____
   $       _____

   $9.25   _____
   $9.75   _____
   $       _____
   $       _____

**Kelee Loper**
   $9.25   38.50
   $9.75   _____
   $       _____
   $       _____

   $9.25   _____
   $9.75   _____
   $       _____
   $       _____

**John Park**
   $9.25   48.00
   $9.75   _____
   $       _____
   $       _____

   $9.25   _____
   $9.75   _____
   $       _____
   $       

**Walter Parker**
   $9.25   _____
   $9.75   112.00
   $       _____
   $       _____

   $9.25   _____
   $9.75   _____
   $       _____
   $       

# Total Hours — 336.00

**From:** Waltfx4247 <waltfx4247@aol.com>
**To:** garyk0123 <garyk0123@aol.com>
**Subject:** Re-send of Fairfax Desk Payroll for the period of August 5-18, 2015
**Date:** Thu, Aug 13, 2015 10:24 am
**Attachments:** Payroll August 5-18, 2015.doc (41K)

Gary:

Sending the payroll again, this time as a Word File since the PDF File did not work for whatever reason.

Walt

(Note: This payroll was sent early at the request of Gary Kerstein.  It also would be the last time the payroll would be sent via e-mail on a regular basis)

# Fairfax Desk Payroll
# Pay Period: August 5-18, 2015

**Debbie Bassett**
$9.25    65.00
$9.75  _____
$      _____
$      _____

**Phylece King**
$9.25    32.00
$9.75  _____
$      _____
$      _____

**Tierra Hayes**
$9.25    37.00
$9.75  _____
$      _____
$      _____

$9.25  _____
$9.75  _____
$      _____
$      _____

**Kelee Loper**
$9.25    48.00
$9.75  _____
$      _____
$      _____

$9.25  _____
$9.75  _____
$      _____
$

**John Park**
$9.25    37.00
$9.75  _____
$      _____
$      _____

$9.25  _____
$9.75  _____
$      _____
$

**Walter Parker**
$9.25    5.00
$9.75   112.00
$      _____
$      _____

$9.25  _____
$9.75  _____
$
$

## Total Hours — 336.00

**Note:** This payroll per earlier requests is being sent six days earlier than usual. Any changes will be reflected in the next pay period (ending Sept. 1).

7/7/2016                                                        Payroll is on desk in office at Fairfax

**From:** Waltfx4247 <waltfx4247@aol.com>
**To:** Garyk0123 <Garyk0123@aol.com>
**Subject:** Payroll is on desk in office at Fairfax
**Date:** Wed, Sep 2, 2015 7:06 am

Gary:

This is to let you know as Marla did not want me e-mailing you the payroll, the payroll is on the desk in the main rental office at the Fairfax.  If you need me to e-mail it, please let me know as soon as possible and thanks.

Walt

(Note: This was the first time the Payroll was left on the desk in the office rather than E-mailed).

# Fairfax Desk Payroll
# Pay Period: August 19 to September 1, 2015

**Debbie Bassett**
$9.25   81.00
$9.75   _____
$   _____
$   _____

**Phylece King**
$9.25   31.50
$9.75   _____
$   _____
$   _____

**Tierra Hayes**
$9.25   22.00
$9.75   _____
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$   _____

**Kelee Loper**
$9.25   39.00
$9.75   _____
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$

**John Park**
$9.25   47.00
$9.75   _____
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$

**Walter Parker**
$9.25   3.50
$9.75   112.00
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$

# Total Hours — 336.00

## *Changes made after the last payroll was sent:*

On August 13, Walt worked one hour for Kellee (Walt +1 hour, Kellee -1 hour)
On August 14, Walt worked one-half hour for Phylece (Walt +0.5 hours, Phylece -0.5 hours)
On August 16, John worked eight hours and Walt worked two hours for Tierra (John +8 hours, Walt +2 hours, Tierra -10 hours)

## *Total adjusted hours from the last pay period:*

John +8 hours
Walt +3.5 hours
Phylece -0.5 hours
Tierra -10 hours

**From:** Waltfx4247 <waltfx4247@aol.com>
**To:** Garyk0123 <Garyk0123@aol.com>
**Subject:** E-mail of Fairfax Desk Payroll
**Date:** Wed, Sep 16, 2015 9:52 am
**Attachments:** Payroll September 2-15, 2015.pdf (34K)

Gary:

Attached is the Fairfax Desk Payroll as asked.

Walt

(Note: Gary Kerstein had specifically requested in this case the payroll be sent via E-mail.
This would be the last time it would be done this way).

# Fairfax Desk Payroll
# Pay Period: September 2-15, 2015

**Debbie Bassett**
$9.25   65.00
$9.75   _____
$   _____
$   _____

**Phylece King**
$9.25   31.00
$9.75   _____
$   _____
$   _____

**Also:**
**Debbie Bassett**
*Holiday*
(Labor Day – Sept. 7)
8 hrs @ 9.25

**Tierra Hayes**
$9.25   25.50
$9.75   _____
**$18.50   9.00
$   _____

$9.25   _____
$9.75   _____
$   _____
$   _____

**Kelee Loper**
$9.25   36.00
$9.75   _____
**$18.50   6.00
$   _____

$9.25   _____
$9.75   _____
$   _____
$

**John Park**
$9.25   43.00
$9.75   _____
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$

**Walter Parker**
$9.25   7.00
$9.75   104.00
**$18.50   1.00
**$19.50   8.00

$9.25   _____
$9.75   _____
$   _____
$

# Total Hours — 335.50
**-Holiday Double Pay (Labor Day, Sept. 7, noted in **BOLD**)

*Note:* This payroll has one-half hour less than usual to note the half-hour no one was at the desk on Wednesday, Sept. 8 (when Tierra missed a combined half-hour due to lateness and leaving early).

# Fairfax Desk Payroll
# Pay Period: September 16-29, 2015

**Debbie Bassett**
| | |
|---|---|
| $9.25 | 57.00 |
| $9.75 | _____ |
| $ | _____ |
| $ | _____ |

**Phylece King**
| | |
|---|---|
| $9.25 | 15.50 |
| $9.75 | _____ |
| $ | _____ |
| $ | _____ |

**Tierra Hayes**
| | |
|---|---|
| $9.25 | 12.00 |
| $9.75 | _____ |
| $ | _____ |
| $ | _____ |

| | |
|---|---|
| $9.25 | _____ |
| $9.75 | _____ |
| $ | _____ |
| $ | _____ |

**Kelee Loper**
| | |
|---|---|
| $9.25 | 45.00 |
| $9.75 | _____ |
| $ | _____ |
| $ | _____ |

| | |
|---|---|
| $9.25 | _____ |
| $9.75 | _____ |
| $ | _____ |
| $ | |

**John Park**
| | |
|---|---|
| $9.25 | 73.00 |
| $9.75 | _____ |
| $ | _____ |
| $ | _____ |

| | |
|---|---|
| $9.25 | _____ |
| $9.75 | _____ |
| $ | _____ |
| $ | |

**Walter Parker**
| | |
|---|---|
| $9.25 | 21.50 |
| $9.75 | 112.00 |
| $ | _____ |
| $ | _____ |

| | |
|---|---|
| $9.25 | _____ |
| $9.75 | _____ |
| $ | |
| $ | |

# Total Hours — 336.00

**From:** Waltfx4247 <waltfx4247@aol.com>
**To:** Garyk0123 <Garyk0123@aol.com>
**Subject:** Fairfax Desk Payroll for Sept. 30-Oct. 13, 2015 is on desk in Fairfax Office
**Date:** Wed, Oct 14, 2015 3:02 am

Gary:

This is to let you know the payroll is on the desk in the Fairfax Office for this pay period.

Walt

(Note: This would be the last time a note was sent on the payroll being done until December 20).

# Fairfax Desk Payroll
## Pay Period: September 30 to October 13, 2015

**Debbie Bassett**
- $9.25  72.00
- $9.75  _____
- $  _____
- $  _____

**Phylece King**
- $9.25  32.00
- $9.75  _____
- $  _____
- $  _____

**Tierra Hayes**
- $9.25  12.00
- $9.75  _____
- $  _____
- $  _____

- $9.25  _____
- $9.75  _____
- $  _____
- $  _____

**Kelee Loper**
- $9.25  45.00
- $9.75  _____
- $  _____
- $  _____

- $9.25  _____
- $9.75  _____
- $  _____
- $  _____

**John Park**
- $9.25  55.00
- $9.75  _____
- $  _____
- $  _____

- $9.25  _____
- $9.75  _____
- $  _____
- $  _____

**Walter Parker**
- $9.25  8.00
- $9.75  112.00
- $  _____
- $  _____

- $9.25  _____
- $9.75  _____
- $  _____
- $  _____

## Total Hours — 336.00

(Note: No e-mail was sent to alert this payroll was on the desk in the Fairfax Office)

# Fairfax Desk Payroll
# Pay Period: October 24-27, 2015

| **Debbie Bassett** | | **Phylece King** | | **Also:** |
|---|---|---|---|---|
| $9.25 | 61.50 | $9.25 | 32.00 | Debbie Bassett |
| $9.75 | _____ | $9.75 | _____ | *Vacation Day* |
| $ | _____ | $ | _____ | (Wed. 10/14) |
| $ | _____ | $ | _____ | 8 hrs @ 9.25 |

| **Tierra Hayes** | | | |
|---|---|---|---|
| $9.25 | 22.50 | $9.25 | _____ |
| $9.75 | _____ | $9.75 | _____ |
| $ | _____ | $ | _____ |
| $ | _____ | $ | _____ |

| **Kelee Loper** | | | |
|---|---|---|---|
| $9.25 | 46.00 | $9.25 | _____ |
| $9.75 | _____ | $9.75 | _____ |
| $ | _____ | $ | _____ |
| $ | _____ | $ | _____ |

| **John Park** | | | |
|---|---|---|---|
| $9.25 | 56.00 | $9.25 | _____ |
| $9.75 | _____ | $9.75 | _____ |
| $ | _____ | $ | _____ |
| $ | _____ | $ | |

| **Walter Parker** | | | |
|---|---|---|---|
| $9.25 | 6.00 | $9.25 | _____ |
| $9.75 | 112.00 | $9.75 | _____ |
| $ | _____ | $ | _____ |
| $ | _____ | $ | |

# Total Hours — 336.00

(Note: No e-mail was sent to alert this payroll was on the desk in the Fairfax Office)

# Fairfax Desk Payroll
# Pay Period: October 28 to November 10, 2015

| **Debbie Bassett** | | **Phylece King** | |
|---|---|---|---|
| $9.25 | 64.50 | $9.25 | 32.00 |
| $9.75 | _____ | $9.75 | _____ |
| $ | _____ | $ | _____ |
| $ | _____ | $ | _____ |

| **Tierra Hayes** | | | |
|---|---|---|---|
| $9.25 | 43.00 | $9.25 | _____ |
| $9.75 | _____ | $9.75 | _____ |
| $ | _____ | $ | _____ |
| $ | _____ | $ | _____ |

| **Kelee Loper** | | | |
|---|---|---|---|
| $9.25 | 46.00 | $9.25 | _____ |
| $9.75 | _____ | $9.75 | _____ |
| $ | _____ | $ | _____ |
| $ | _____ | $ | _____ |

| **John Park** | | | |
|---|---|---|---|
| $9.25 | 31.00 | $9.25 | _____ |
| $9.75 | _____ | $9.75 | _____ |
| $ | _____ | $ | _____ |
| $ | _____ | $ | _____ |

| **Walter Parker** | | | |
|---|---|---|---|
| $9.25 | 7.50 | $9.25 | _____ |
| $9.75 | 113.00 | $9.75 | _____ |
| $ | _____ | $ | _____ |
| $ | _____ | $ | _____ |

## Total Hours — 337.00*

*-There was one extra hour in this pay period because of the change to standard time (early Sunday, Nov. 1)

This payroll was done one day earlier than usual due to the Veterans Day Holiday.  Any changes on Tuesday 11/10 after this will be sent with the next payroll early Monday, November 22.  That payroll will be sent two days earlier than usual due to the Thanksgiving Holiday that week.

(Note: No e-mail was sent to alert this payroll was on the desk in the Fairfax Office)

# Fairfax Desk Payroll
# Pay Period: November 11-24, 2015

**Debble Bassett**
$9.25   82.50
$9.75   _____
$   _____
$   _____

**Phylece King**
$9.25   41.00
$9.75   _____
$   _____
$   _____

**Tlerra Hayes**
$9.25   12.00
$9.75   _____
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$   _____

**Kelee Loper**
$9.25   48.00
$9.75   _____
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$   _____

**John Park**
$9.25   39.50
$9.75   _____
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$   _____

**Walter Parker**
$9.25   1.00
$9.75   112.00
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$   _____

# Total Hours — 336.00

**Note:** This payroll is being sent in two days earlier than usual due to the Thanksgiving holiday.  Any changes will be reflected in the next pay period.

(Note: No e-mail was sent to alert this payroll was on the desk in the Fairfax Office)

# Fairfax Desk Payroll
# Pay Period: November 25-December 8, 2015

**Debbie Bassett**
- $9.25    57.00
- $9.75    _____
- $    _____
- $    _____

**Tierra Hayes**
- $9.25    25.00
- $9.75    _____
- $    _____
- $    _____

**Kelee Loper**
- $9.25    45.00
- $9.75    _____
- **$18.50    3.00
- $    _____

**John Park**
- $9.25    45.00
- $9.75    _____
- **$18.50    6.00
- $    _____

**Walter Parker**
- $9.25    4.00
- $9.75    104.00
- **$19.50    8.00
- $    _____

**Phylece King**
- $9.25    32.00
- $9.75    _____
- **$18.50    7.00
- $    _____

- $9.25    _____
- $9.75    _____
- $    _____
- $    _____

- $9.25    _____
- $9.75    _____
- $    _____
- $    _____

- $9.25    _____
- $9.75    _____
- $    _____
- $    _____

- $9.25    _____
- $9.75    _____
- $    _____
- $    _____

**Also:**
Debbie Bassett - Holiday
(Thanksgiving. Nov.26)
8 hours @ 9.25

# Total Hours — 336.00
**-Holiday Double Pay (Thanksgiving, November 26, listed in **BOLD**).

*Note:* Unless needed earlier, I plan to print and have the next payroll ready early Monday, December 21 due to the fact with the normal payday (Friday 12/25) being Christmas Day, banks being closed that day and many taking the day before off for the Christmas holiday, everything likely needs to be done at least one day earlier than usual. I will be including all unused vacation days for Debbie and John in that payroll.

**From:** Waltfx4247 <waltfx4247@aol.com>     (Note: No e-mails noting the payrolls between October 14 and December 21,
**To:** Garyk0123 <Garyk0123@aol.com>     2015 being done were sent as those were not needed).
**Subject:** Fairfax Desk Payroll is on desk in office
**Date:** Mon, Dec 21, 2015 4:51 am

Gary:

This is to let you know the payroll for the period of December 9-22, 2015 has been printed and is on the desk in the office. This payroll was done two days earlier than usual due to this Friday (Dec, 25) being Christmas Day and as a result of that, needing to be paid on Thursday, Dec. 24, one day earlier than usual due to all financial institutions being closed on Christmas Day.

As this is the final full pay period (and final submitted payroll) of the year, included with this payroll are ALL previously unused vacation days to the best of my knowledge (four vacation days for Debbie and six and a quarter vacation days for John that he was eligible for in 2015 based on his working hours in 2014).

Also on the desk is a sheet of hours worked by John for 2015, including his scheduled hours for the remaining days of 2015. Based on this, John averaged 22.61 hours per week in 2015, meaning for 2016 John will be eligible for five vacation days, three sick days and three personal days in the new year.

Walt

# Fairfax Desk Payroll
# Pay Period: December 9-22, 2015

**Debbie Bassett**
$9.25   71.00
$9.75   _____
$   _____
$   _____

**Tierra Hayes**
$9.25   34.00
$9.75   _____
$   _____
$   _____

**Kelee Loper**
$9.25   45.00
$9.75   _____
$   _____
$   _____

**John Park**
$9.25   41.00
$9.75   _____
$   _____
$   _____

**Walter Parker**
$9.25   1.00
$9.75   112.00
$   _____
$   _____

**Phylece King**
$9.25   32.00
$9.75   _____
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$   _____

$9.25   _____
$9.75   _____
$   _____
$

$9.25   _____
$9.75   _____
$   _____
$

$9.25   _____
$9.75   _____
$   _____
$

**Vacation Days:**
John Park
*6 1/4 Vacation Days*
(Dec. 9-11 & 14-17)
50 hrs @ 9.25

Debbie Bassett
*4 Vacation Days*
(Dec. 9-12)
32 hrs @ 9.25

## Total Hours — 336.00

**Note 1:** This payroll was done and submitted two days earlier than usual due to Friday (Dec. 25) being Christmas Day and because of that, having to be paid one day earlier than usual on Christmas Eve (Thurs. 12/24). All changes made during the remainder of this pay period will be reflected on the next payroll (to be submitted Wednesday, January 6).

**Note 2:** As this is the final full pay period (and last submitted payroll) of the year, all previously unused vacation days to my knowledge are being included.  Debbie to my knowledge had four vacation days she never used during the year and John never used any of his.  John was eligible for five-eighths vacation (six and a quarter days) and sick/personal pay in 2015 as he worked on average over 25 hours each week during 2014.

7/7/2016                                  Re: Fairfax Desk Payroll for Dec. 23, 2015-Jan. 5, 2016 is on the desk at the Farifax Office

**From:** Waltfx4247 <waltfx4247@aol.com>
**To:** garyk0123 <garyk0123@aol.com>
**Subject:** Re: Fairfax Desk Payroll for Dec. 23, 2015-Jan. 5, 2016 is on the desk at the Farifax Office
**Date:** Wed, Jan 6, 2016 10:49 am
**Attachments:** Payroll December 23, 2015-January 5, 2016.docx (21K)

Gary:

Here is the payroll.  Thanks for the alert.          (Note: Someone had apparently accidentally thrown out the original payroll, so
                                                       this was an attempt to get it to him via E-mail.  It was subsequently left on the
Walt                                                   desk in the Fairfax Office).


——Original Message——
From: garyk0123 <garyk0123@aol.com>
To: waltfx4247 <waltfx4247@aol.com>
Sent: Wed, Jan 6, 2016 10:41 am
Subject: Re: Fairfax Desk Payroll for Dec. 23, 2015-Jan. 5, 2016 is on the desk at the Farifax Office

Walt,

The payroll sheet is not on the desk in the office.  Not sure what happened to it, but I can not
do payroll without it.

Please send it to me asap.

Gary


——Original Message——
From: Waltfx4247 <waltfx4247@aol.com>
To: Garyk0123 <Garyk0123@aol.com>
Sent: Wed, Jan 6, 2016 2:19 am
Subject: Fairfax Desk Payroll for Dec. 23, 2015-Jan. 5, 2016 is on the desk at the Farifax Office

Gary:

This is to let you know the payroll for Dec. 23-Jan. 5 is on the desk at the Fairfax Office.  This includes double pay for
Christmas and New Year's (Dec. 25 & Jan. 1) along with Holiday Pay for Debbie and my Vacation Pay for 2016.

Walt

# Fairfax Desk Payroll
# Pay Period: Dec. 23, 2015 to Jan. 5, 2016

**Debbie Bassett**
$9.25  56.00
$9.75  _____
$  _____
$  _____

**Tierra Hayes**
$9.25  43.00
$9.75  _____
**$18.50  13.50
$  _____

**Kelee Loper**
$9.25  48.00
$9.75  _____
$  _____
$  _____

**John Park**
$9.25  29.00
$9.75  _____
$  _____
$  _____

**Walter Parker**
$9.25  _____
$9.75  96.00
**$18.50  2.50
**$19.50  16.00

**Phylece King**
$9.25  16.00
$9.75  _____
**$18.50  16.00
$  _____

$9.25  _____
$9.75  _____
$  _____
$  _____

$9.25  _____
$9.75  _____
$  _____
$  _____

$9.25  _____
$9.75  _____
$  _____
$  _____

$9.25  _____
$9.75  _____
$  _____
$  _____

**Also:**
Debbie Bassett
Holiday Pay
(Dec. 25 & Jan. 1)
16 hrs @ 9.25

Walter Parker
*Vacation Pay*
(1/2-6 & 1/11-15, 2016)
80 hrs @ 9.25

# Total Hours — 336.00
**** - Holiday Double Pay (Dec. 25 & Jan. 1, listed in BOLD)**

**From:** Waltfx4247 <waltfx4247@aol.com>

**To:** Garyk0123 <Garyk0123@aol.com>

**Subject:** Fairfax Desk Payroll for January 6-19, 2016 is on the desk in the office and on a PDF

**Date:** Wed, Jan 20, 2016 2:24 am

Gary:

This is to let you know the payroll for January 6-19, 2016 is on the desk in printed form and also on a PDF on the computer in the front office in a new file marked "Payroll PDFs" in the Fairfax Documents folder in My Documents (done to avoid a repeat of two weeks ago when the copy left on the desk apparently got accidentally thrown out).  This includes my vacation pay for 2016 that I did not get when originally requested.

In trying to get a copy of the Payroll on the machine, however, the hard drive on there went out, though it did come back up on a reboot and I was able to properly shut the machine down after getting the copy on.  This seems to be an ongoing issue in the last couple of weeks as this never was an issue before when I've had to print something on there.

Even before the machine in the office went to windows, I was getting the message that the disk had to be scanned for errors.  Given the way the disk went out, it suggests that the disk itself may be on its last legs (I've had hard drives go on me like that before), which suggests what you need to do is clone everything on the disk (if necessary using an external enclosure and taking the hard drive out of the current machine, probably doing this on another machine) to a new hard drive or solid state drive (using an external enclosure) that can replace it in the system (as operating systems after XP will only support legacy DOS software in the smaller windows as opposed to the full screen that XP supports).  There is cloning software available for this.  Once a new drive is cloned, that drive can go in that machine to replace the old one.  As that is a much older machine, any new drive would likely need a SATA-to-IDE converter to be used with it since most older machines do not support SATA drives without such a converter (Solid State Drives in particular do speed up older systems and SSDs are what I use on my machines as they have come down in price considerably).

Walt

# Fairfax Desk Payroll
# Pay Period: January 6-19, 2016

**Debble Bassett**
- $9.25  72.00
- $9.75  _____
- $  _____
- $  _____

**Tierra Hayes**
- $9.25  _____
- $9.75  _____
- $  _____
- $  _____

**Kelee Loper**
- $9.25  45.00
- $9.75  _____
- $  _____
- $  _____

**John Park**
- $9.25  71.00
- $9.75  _____
- $  _____
- $  _____

**Walter Parker**
- $9.25  4.50
- $9.75  112.00
- $  _____
- $  _____

**Phylece King**
- $9.25  31.50
- $9.75  _____
- $  _____
- $  _____

- $9.25  _____
- $9.75  _____
- $  _____
- $  _____

- $9.25  _____
- $9.75  _____
- $  _____
- $  _____

- $9.25  _____
- $9.75  _____
- $  _____
- $  _____

- $9.25  _____
- $9.75  _____
- $  _____
- $  _____

**Also:**
Walter Parker
*Vacation Pay - 10 Days*
(1/6-10 & 13-17, 2016)
80 hrs @ 9.25

## Total Hours — 336.00

7/7/2016                    Fairfax Desk Payroll is on the desk in the office

**From:** Waltfx4247 <waltfx4247@aol.com>
**To:** Garyk0123 <Garyk0123@aol.com>
**Subject:** Fairfax Desk Payroll is on the desk in the office
**Date:** Wed, Feb 3, 2016 4:46 am

Gary:

This is to let you know the desk payroll for January 20-February 2, 2016 is on the desk in the front office.  This includes a personal day for Debbie for January 25.

There are also PDF and Word files of the payroll on the computer in the front office in the "Payroll PDFs" folder in case it needs to be re-printed.

Walt

**From:** Waltfx4247 <waltfx4247@aol.com>

**To:** Garyk0123 <Garyk0123@aol.com>

**Subject:** Fairfax Desk payroll for February 3-16, 2016 is on the desk in the front office

**Date:** Wed, Feb 17, 2016 5:46 am

Gary:

This is to let you know the payroll for this period (February 3-16, 2016) is on the desk in the front office. A PDF is also on the computer there in the Payroll PDFs folder in case the printed copy got lost.

Also, I'm sure you are aware we are low on paper for the copy machine in the office and have been since at least late last week (notable because I had to cut down on the number of package slips for the desk as I to print a lot all at once due to the sharp increase in the number of packages we now get from years past).

Walt

# Fairfax Desk Payroll
# Pay Period: February 3-16, 2016

**Debbie Bassett**
$9.25  72.00
$9.75  _____
$  _____
$  _____

**Phylece King**
$9.25  0.00
$9.75  _____
$  _____
$  _____

**Tierra Hayes**
$9.25  14.00
$9.75  _____
$  _____
$  _____

$9.25  _____
$9.75  _____
$  _____
$  _____

**Kelee Loper**
$9.25  45.00
$9.75  _____
$  _____
$  _____

$9.25  _____
$9.75  _____
$  _____
$  _____

**John Park**
$9.25  73.00
$9.75  _____
$  _____
$  _____

$9.25  _____
$9.75  _____
$  _____
$  _____

**Walter Parker**
$9.25  20.00
$9.75  112.00
$  _____
$  _____

$9.25  _____
$9.75  _____
$  _____
$  _____

# Total Hours — 336.00

# Fairfax Desk Payroll

**Pay Period:** February 17-March 1, 2016 (Note: This payroll was never actually submitted as it was done after situations on February 29 forced the personal day noted).

**Debbie Bassett**
- $9.25    62.50
- $9.75    _____
- $    _____
- $    _____

**Tierra Hayes**
- $9.25    25.50
- $9.75    _____
- $    _____
- $    _____

**Kelee Loper**
- $9.25    44.50
- $9.75    _____
- $    _____
- $    _____

**John Park**
- $9.25    54.00
- $9.75    _____
- $    _____
- $    _____

**Walter Parker**
- $9.25    12.50
- $9.75    104.00
- $    _____
- $    _____

**Phylece King**
- $9.25    24.00
- $9.75    _____
- $    _____
- $    _____

**Horace Patterson**
- $9.25    1.00
- $9.75    8.00
- $    _____
- $    _____

- $9.25    _____
- $9.75    _____
- $    _____
- $    _____

- $9.25    _____
- $9.75    _____
- $    _____
- $    _____

- $9.25    _____
- $9.75    _____
- $    _____
- $    _____

**Sick/Personal Days:**
**Debbie Bassett**
*Personal Day*
(February 19)
8 hrs @ 9.25

**Walter Parker**
*Personal Day*
(March 1)
8 hrs @ 9.25

# Total Hours — 336.00